Tech Plus, Inc., & another[1] *vs.* Michael Ansel & another.[2]

No. 01-P-1293.

Norfolk. June 9, 2003. - August 21, 2003.

Present: Gelinas, Mason, & Kafker, JJ.

*Unlawful Interference. Contract,* Interference with contractual relations. *Actionable Tort. Consumer Protection Act,* Attorney's fees, Damages. *Libel and Slander. Emotional Distress. Conspiracy.*

In a civil action brought by a company (and its president and sole shareholder) against a former employee and his father, the judge properly allowed the defendants' motion for judgment notwithstanding the verdict on the plaintiffs' claims of intentional interference with their existing and prospective business relations, where the plaintiffs failed to establish any actual pecuniary loss as a result of the defendants' allegedly improper conduct. [17-19]

A judge in a civil action properly allowed the defendants' motion to vacate a judgment that the defendants' acts of intentional interference constituted wilful and knowing violations of G. L. c. 93A, and entitled the plaintiffs to recover double damages and attorney's fees under G. L. c. 93A, § 11, where the plaintiffs did not properly raise below the contention that they suffered a loss of money or property as a result of the defendants' practices. [19-21]

In a civil action, the judge erred in dismissing the defamation claim of the plaintiff, a sales agent, concerning a defendant employee's statement characterizing the plaintiff as anti-Semitic, where statements that the plaintiff was anti-Semitic, had told anti-Semitic jokes in one defendant's presence, and had constantly persecuted that defendant because of his Jewish heritage, constituted assertions of fact, rather than constitutionally protected expressions of opinion, and were actionable without proof of economic loss or harm in that they concerned a quality the plaintiff needed to be a successful sales agent [21-25]; consequently, the judge erred in also dismissing a claim of intentional infliction of emotional distress based on those statements (particularly as the claim was supported by sufficient evidence) and a civil conspiracy claim based on the alleged defamation [25-26].

In a civil action, the judge properly dismissed a defamation claim concerning a statement characterizing the plaintiff as prejudiced against homosexuals where the allegedly defamatory statement constituted nonactionable

[1]Betsy Piper.
[2]Sumner Ansel.

opinion; likewise, a defamation claim concerning one defendant's statement that the plaintiff was "sick" and "mentally ill" and "lived with two hundred cats" warranted dismissal where the statements could not reasonably have been understood as assertions of actual fact about the subject. [26]

CIVIL ACTION commenced in the Superior Court Department on August 6, 1996.

Motions for summary judgment were heard by *Ralph D. Gants*, J., and the case was tried before *Patrick F. Brady*, J.

*John R. Chayrigues & Peter J. Pingitore* for the plaintiffs.

*Joseph P. Dever* for the defendants.

MASON, J. The plaintiff, Tech Plus, Inc. (Tech Plus), is a business which acts as a sales representative for various manufacturers of high tech consumer products. After one of its clients, Lumina Office Products, Inc. (Lumina), refused to continue using its services in connection with a transaction Lumina had entered into with Staples Office Supply, Inc. (Staples), Tech Plus and its president and sole shareholder, Betsy Piper (Piper), brought this action against the defendants, Michael Ansel (Michael), a former employee of Tech Plus, and his father Sumner Ansel (Sumner).

The complaint alleged claims of intentional interference with advantageous business, contractual, and prospective business relations (intentional interference), violation of the employee duty of loyalty, defamation, intentional infliction of emotional distress, civil conspiracy,[3] and violation of G. L. c. 93A. The defendants asserted counterclaims for abuse of process, breach of contract and the implied duty of good faith and fair dealing, negligence, discrimination, and violation of G. L. c. 93A.

Following discovery, a Superior Court judge allowed the defendants' motion for summary judgment solely on the plaintiffs' claims of defamation and intentional infliction of emotional distress. He also allowed the plaintiffs' motion for summary judgment and dismissed the defendants' counterclaims.

A jury trial was then held before another Superior Court judge, and resulted in verdicts for the plaintiffs on their claims of intentional interference, violation of the employee duty of

---

[3]This claim was referred to in the complaint as "Concert of Action."

loyalty, and civil conspiracy. The jury awarded $17,000 to Tech Plus for damage to its reputation caused by Michael's interference, $10,000 to Tech Plus for damage to its reputation caused by Sumner's interference, and $20,000 to Piper for emotional distress caused by Michael's interference. It also awarded Tech Plus an additional $2,200 on its claim against Michael for violation of the employee duty of loyalty. The judge separately found that the defendants' acts of intentional interference constituted wilful and knowing violations of G. L. c. 93A, entitling the plaintiffs to double damages under G. L. c. 93A, § 11, and an award of attorney's fees.

Following the entry of judgments, however, the judge allowed a motion by defendants for judgment notwithstanding the verdict (judgment n.o.v.) dismissing the plaintiffs' claims of intentional interference and civil conspiracy because the plaintiffs had failed to prove that they had suffered any actual economic harm or pecuniary loss as a result of the defendants' actions.[4] He also allowed a separate motion by the defendants to vacate the c. 93A judgment because the plaintiffs had failed to prove that they had suffered any actual loss of money or property within the meaning of G. L. c. 93A, § 11.

The plaintiffs have appealed from the allowance of the defendants' motion for judgment n.o.v. and motion to vacate the c. 93A judgment, and also appeal from the summary judgment dismissing their claims for defamation and intentional infliction of emotional distress. We conclude that the defendants' motions for judgment n.o.v. and to vacate the c. 93A judgment were properly allowed and we direct the entry of an appropriate judgment reflecting that allowance.[5] However, we reverse the judgment dismissing the claims of defamation and intentional inflic-

---

[4] The judge denied the defendants' motion for judgment n.o.v. to the extent it sought to vacate the jury verdict on Tech Plus's claim against Michael for breach of the employee duty of loyalty, and the defendants have not appealed from the amended judgment that was entered on that claim, nor do the defendants appeal from the summary judgment entered on their counterclaims. Those portions of each judgment are affirmed.

[5] It does not appear that any separate judgment was entered in accordance with the judge's allowance of the defendants' motions for judgment n.o.v. and to vacate the c. 93A judgment. Nevertheless, we will deal with the merits of the matter. See *GTE Prods. Corp.* v. *Stewart*, 421 Mass. 22, 24 n.3 (1995).

tion of emotional distress and, in light of that reversal, direct a new trial on the claim of civil conspiracy.

*The facts.* We summarize the pertinent facts as shown by the portions of the trial transcript and other materials included in the record appendix.

Lumina is a California corporation engaged in the manufacture of various scanning and facsimile machines. In August, 1995, Stephen Cason, Lumina's vice president for retail sales, contacted Piper to request that Tech Plus represent it in connection with a new Lumina product called the Lumina 2000. The Lumina 2000 was a combination scanning and facsimile machine which could operate with the owner's existing printer and had certain unique and innovative features. Lumina previously had identified Staples, a large retailer of office products headquartered in the New England area, as one of its principal sales targets.

On August 5, 1995, Tech Plus and Lumina entered into a manufacturer's sales agreement appointing Tech Plus as its sales representative for Lumina office products in the New England area. In October, 1995, Tech Plus hired Michael as a sales representative.

Following his hire, Michael indicated to Piper that both he and Sumner, who had previously sold products to Staples, knew Wayne Eckstein, an officer at Staples who was responsible for purchasing scanning and facsimile machines. Michael further indicated that he could arrange a meeting for Lumina with Eckstein if Piper wanted him to do so. Piper agreed with this proposal and a meeting was arranged for November 27, 1995.

Prior to the meeting, Piper, who had known Cason for several years and believed that he was homosexual, asked Michael if he believed that Cason's sexual orientation would be a problem for Eckstein. Michael responded that he did not believe that it would be a problem for Eckstein.

When the meeting was held, Cason presented the Lumina 2000 to Eckstein, and Eckstein expressed interest in having Staples test market the machine in certain of its stores in the New York area for a period of ninety days. Eckstein indicated that Staples would issue a purchase order for several of the machines in December, 1995, and would establish a tentative

test roll-out date for January 1, 1996. He also indicated that he wanted Michael to be involved in the transaction.

Piper told Michael, however, that she would be the sales representative for Lumina on its transaction with Staples, and that he would be limited to handling such detail work as instructing the Staples store staff with respect to the capabilities of the Lumina 2000. Michael was disappointed with this decision and, accordingly, began to plan to leave Tech Plus.

On December 5, 1995, Cason received a telephone call from Michael but was unable to talk to him. A few days later, Cason received a telephone call from Eckstein. Eckstein stated during this call that he did not want Piper to be Lumina's sales representative on its transaction with Staples, but he did not indicate why he had reached that decision.

On December 13, 1995, Cason had a telephone conversation with Michael. During this conversation, Michael stated, among other things, that he was unhappy at Tech Plus and was planning to leave his employment there. He further stated that Piper "could not do anything" for Lumina on the Staples account and, in fact, was anti-Semitic, had made derogatory, anti-Semitic jokes and comments in his presence and was "constantly persecuting him" because of his Jewish heritage. He also stated that Piper was prejudiced against homosexuals and that she had asked him prior to the November 27 meeting at Staples whether Eckstein would have a problem with Cason being gay.

During this conversation, Michael further stated to Cason that, in contrast to Piper, he and his family had had a close personal relationship with Eckstein and Staples for many years and that he had been fully responsible for inducing Staples to enter into the transaction with Lumina. Michael stated that he was interested in working directly for Lumina as its sales representative on the transaction. When Cason did not respond by agreeing to hire him, Michael indicated to Cason that Cason could lose his job if he failed to hire Michael.

In the evening of December 13, 1995, Cason received a telephone call from Sumner. During this call, Sumner stated that Piper was "sick" and "mentally ill," and "lived with two hundred cats." He stated that Piper was anti-Semitic and was persecuting his son. He also stated that Eckstein wanted to take

care of Michael because of the long relationship Michael and his family had had with him, and he urged Cason to use Michael, rather than Piper, as the sales representative for Lumina's transaction with Staples. Sumner stated that, to the extent that Michael might not be able to handle all the responsibilities with respect to the transaction, he (Sumner) could "fill in the gaps."

On December 14, 1995, Michael told Piper that he was leaving Tech Plus. The next day, December 15, 1995, Cason telephoned Piper and reported what the Ansels had said to him about Piper being anti-Semitic and prejudiced against homosexuals. Piper denied being anti-Semitic and said that she had never taken any action against Michael because of his Jewish heritage. She also denied that she was prejudiced against homosexuals and told Cason she had asked the question about Eckstein prior to the November 27 meeting only because she had heard people speculate that Cason was gay and she knew that Eckstein could be volatile. Cason told Piper that she should not contact Staples, and that he would handle Lumina's transaction with Staples.

Thereafter, Staples placed a purchase order with Lumina for the test sale of the Lumina 2000 machines, and Lumina shipped several of the machines to Staples in response to that order. Lumina, however, served as its own sales representative with respect to these sales, and did not utilize the services of either Michael or Tech Plus. Nevertheless, Lumina paid Tech Plus all the commissions Tech Plus would have earned had it been retained as the sales representative for the transaction. Tech Plus, accordingly, did not lose any commissions, or otherwise suffer any economic loss, as a result of being removed as sales representative for the transaction between Lumina and Staples.

Staples carried the Lumina machines for a period of ninety days in its stores in the New York and New Jersey area. However, sales of the machines failed to meet the agreed upon targets, and Staples accordingly declined to carry the machines beyond the initial ninety-day test period.

1. *Allowance of motion for judgment n.o.v. dismissing intentional interference claims.* The plaintiffs do not dispute that they failed to establish at trial any actual pecuniary loss as a

result of the defendants' allegedly improper conduct. Nevertheless, they contend that the judge erred in allowing the defendants' motion for judgment n.o.v. on their claims of intentional interference with their existing and prospective business relations because they were not required to show that they had suffered any such actual pecuniary loss in order to recover on such claims. In support of this argument, the plaintiffs assert that they need only demonstrate damages for emotional distress and harm to their reputation in order to recover for their intentional interference claims. We disagree. "[I]t is clear, under decided cases, that the essence of the tort is damage to a business relationship or contemplated contract of economic benefit." *Ratner* v. *Noble*, 35 Mass. App. Ct. 137, 138 (1993).

In *Ratner* v. *Noble* (*Ratner*), *supra*, we held that a plaintiff could not recover on a claim for tortious interference with advantageous relationships where she had failed to show that she had suffered any pecuniary loss as a result of the defendant's actions. The plaintiff in *Ratner* was the president of a gay and lesbian alcohol and drug treatment center who asserted a claim of intentional interference with contractual relations against the defendant based on the defendant's alleged mailing of numerous anonymous letters intended to discredit her in the gay and lesbian community. The jury awarded the plaintiff $60,000 on this claim but we held that the verdict should have been set aside because the plaintiff had failed to show that the mailings had caused her to lose her job or otherwise suffer any economic harm, as distinct from possible damage to her professional reputation within the gay and lesbian community. *Id.* at 138-139. In reaching this result in *Ratner*, we noted that there could be no recovery on a claim for tortious interference with advantageous relationships unless the elements of the tort had been made out, and that pecuniary loss was one of those elements. *Ibid.* See also *Walker* v. *Cronin*, 107 Mass. 555, 564-565 (1871); Restatement (Second) of Torts § 766 comment t (1979) ("The cause of action is for pecuniary loss resulting from the interference").

Here, just as in *Ratner*, the plaintiffs failed to show that they suffered any pecuniary loss as a result of the defendants' conduct. While the plaintiffs were removed as sales representa-

tives on Lumina's transaction with Staples, they received all the commissions they would have received had they continued as sales representatives with respect to that transaction. There was no evidence that the plaintiffs suffered any other harm to their existing or prospective business relationships with Lumina, Staples, or any other entity. Because the plaintiffs failed to prove an essential element of their claims of intentional interference, i.e., actual pecuniary loss as a result of the defendants' actions, the judge correctly allowed the defendants' motion for judgment n.o.v. on those claims.[6] See *Lynch* v. *Boston*, 180 F.3d 1, 19 (1st Cir. 1999). Contrast *Draghetti* v. *Chmielewski*, 416 Mass. 808, 819 (1994) (upholding award of emotional distress damages to plaintiff who proved that defendant's interference had caused him to lose part-time job).

2. *Allowance of motion to vacate c. 93A finding.* To recover damages or attorney's fees under c. 93A, § 11, a plaintiff must show that he has suffered a "loss of money or property, real or personal."[7] " 'Money' means money, not time, and . . . 'property' means the kind of property that is purchased or leased, not such intangibles as a right to a sense of security, to peace of mind, or to personal liberty." *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 45 (1975).[8]

The plaintiffs contend that they established a loss of money

---

[6]We reject the plaintiffs' argument that our decision in *Ratner* is not applicable here because the plaintiff in *Ratner* alleged interference only with social relationships, whereas here the plaintiffs alleged interference with an economic relationship. There is no indication in *Ratner* that the relationships were strictly social. In any event, we relied in *Ratner* on the plaintiff's failure to show that she had suffered any pecuniary loss, and not on the particular type of relationships contained in the allegations. *Ratner* v. *Noble, supra* at 138-139.

[7]General Laws c. 93A, § 11, provides: "Any person who engages in the conduct of any trade or commerce *and who suffers any loss of money or property, real or personal*, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two . . . may, as hereinafter provided, bring an action in the superior court. . . ." (Emphasis added).

[8]Although the court in *Baldasarri* v. *Public Fin. Trust, supra*, dealt with G. L. c. 93A, § 9, its construction of the phrase "loss of money or property" as it appeared in that section has been held to apply to the same phrase as it appears in § 11 of the statute. See *Halper* v. *Demeter*, 34 Mass. App. Ct. 299, 304 (1993).

or property in this case because they introduced evidence that Tech Plus had incurred long distance telephone call expenses both in responding to the defendants' wrongful acts, and also at the time the acts occurred. Specifically, the plaintiffs refer to testimony by Piper that she discussed the Staples transaction with Cason on "multiple occasions" after he notified her of the statements the defendants had made. They also refer to testimony by Michael that his conversation with Cason on December 13, 1995, had occurred as a result of his "calling up" Cason.

The record does not demonstrate that the plaintiffs advanced this contention before the Superior Court judge. They are, therefore, barred from asserting it for the first time on appeal. See *Cottam* v. *CVS Pharmacy*, 436 Mass. 316, 323 (2002).

Even if the argument were properly raised, Piper did not testify that Tech Plus had incurred any separate, identifiable expense as a result of her conversations with Cason with respect to the Staples transaction following the events of December 13, 1995. Indeed, Piper did not indicate where those conversations had occurred, let alone that Tech Plus had incurred long distance telephone charges in connection with them. Nor was there any evidence that Tech Plus had incurred any separate, identifiable expense with respect to Michael's conversation with Cason on December 13, 1995. Hence, the plaintiffs did not establish that they had incurred any long distance telephone call expenses either in responding to the defendants' acts, or at the time the acts occurred.

The plaintiffs also contend that they established a loss of money or property because they showed that Tech Plus had suffered damage to its reputation as a result of the defendant's conduct. They point specifically to a finding made by the judge that "for a period of at least several months, Tech Plus'[s] good name was under a cloud."

It is not clear from the record what evidence the judge was relying on in finding that Tech Plus's reputation was "under a cloud" for several months following the defendants' actions. However, such a temporary loss of reputation cannot by itself constitute a "loss of money or property" as those words are used in G. L. c. 93A, § 11, where, as here, the plaintiffs have

failed to show that they suffered any tangible economic harm or pecuniary loss as a result of the defendants' actions. Compare *Baldassari* v. *Public Fin. Trust, supra* (word "property" as it appeared in G. L. c. 93A, § 9, did not include "such intangibles as a right to a sense of security, to peace of mind, or to personal liberty"); *Paul* v. *Davis,* 424 U.S. 693, 701 (1976) ("reputation alone, apart from some more tangible interests such as employment, [is not] either 'liberty or property' by itself sufficient to invoke the procedural protection of the Due Process Clause"). We, therefore, reject the plaintiffs' argument that they were entitled to recover on their claims under G. L. c. 93A, § 11.

Finally, the plaintiffs contend that Piper showed that she had suffered a loss of money or property because she introduced evidence that she had incurred attorney's fees in bringing this action and in defending against the defendants' counterclaims. A plaintiff, however, may not show that she has suffered a loss of money or property within the meaning of § 11 merely by showing that she has incurred attorney's fees and other costs in bringing an action under the statute. See *Jet Line Servs., Inc.* v. *American Employers Ins. Co.,* 404 Mass. 706, 718 (1989). Rather, she must show that she was forced to incur such expenses as a result of the defendants' initiation of litigation which itself constituted a violation of the statute. See *Columbia Chiropractic Group, Inc.* v. *Trust Ins. Co.,* 430 Mass. 60, 63 (1999). The plaintiffs made no such showing here and, hence, the attorney's fees and other expenses they may have incurred in connection with this action did not by themselves constitute a loss of money or property within the meaning of § 11. See *Halper* v. *Demeter,* 34 Mass. App. Ct. 299, 304-305 (1993).

3. *Allowance of summary judgment on plaintiffs' defamation claims.* In the memorandum of decision on the defendants' motion for summary judgment that dismissed the plaintiffs' defamation claims, the motion judge held that Michael's statements (which Sumner repeated) that Piper was anti-Semitic and had persecuted him because of his Jewish heritage were statements of opinion that were not susceptible of proof or disproof and, hence, could not provide a basis for a defamation claim. See *Cole* v. *Westinghouse Bdcst. Co.,* 386 Mass. 303, 312-313, cert. denied, 459 U.S. 1037 (1982). In reaching this result, the judge

recognized that the statements essentially alleged "that Piper discriminated against Michael in the conditions of his employment based on his religion," and that "we ask juries to reach a verdict on issues such as this in every discrimination case [brought under G. L. c. 151B]." Nevertheless, the judge reasoned that the statements of Michael and Sumner constituted nonactionable statements of opinion because "an allegation of discrimination, like an allegation of bigotry, focuses on a person's state of mind," and "no one can see inside another's mind."

It is well settled that "[a]n assertion that cannot be proved false cannot be held libellous." *Cole* v. *Westinghouse Bdcst. Co.*, *supra* at 312, quoting from *Hotchner* v. *Castillo-Puche*, 551 F.2d 910, 913 (2d Cir.), cert. denied sub nom. *Hotchner* v. *Doubleday & Co.*, 434 U.S. 834 (1977). An allegation that a supervisor has harassed or otherwise discriminated against an employee in his or her employment, however, can be proved false. Indeed, as the judge himself recognized, we regularly ask jurors to decide such questions in a multitude of different cases brought under G. L. c. 151B and other anti-discrimination statutes. See, e.g., *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. 156, 161-162 (1987); *Melnychenko* v. *84 Lumber Co.*, 424 Mass. 285, 287-288 (1997).

We, therefore, conclude that the judge erred in determining that the alleged statements about Piper being anti-Semitic and having persecuted Michael because of his Jewish heritage constituted nonactionable opinion merely because they concerned Piper's alleged state of mind. See *Ward* v. *Zelikovsky*, 136 N.J. 516, 538 (1994) (accusation of bigotry may be actionable where it is made "in such manner or under such circumstances as would fairly lead a reasonable listener to conclude that [the person making the accusation] had knowledge of specific facts supporting the conclusory accusation"); Annot., Imputation of Alleged Objectionable Political or Social Beliefs or Principles as Defamation, 62 A.L.R. 4th 314, 465-475 (1988) (collecting additional cases). A given state of mind is a fact that can be proved like any other and, indeed, is proved in every criminal prosecution.

Nor can we discern any other proper basis for holding that the statements constituted nonactionable opinion. In deciding this question, we must consider "all the words used, not merely a particular phrase or sentence." See *Cole* v. *Westinghouse Bdcst. Co., supra* at 309, quoting from *Information Control Corp.* v. *Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980). We must also consider "all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Ibid.* See Restatement (Second) of Torts § 566 comment e (1977) ("The circumstances under which verbal abuse is uttered affect the determination of how it is reasonably to be understood").

Here, there was evidence in the summary judgment record[9] that Michael not only had asserted generally that Piper was anti-Semitic but also, as purported factual support for that statement, had asserted that Piper had told anti-Semitic jokes in his presence and was "constantly persecuting" him because of his Jewish heritage. These latter statements plainly alleged that Piper had taken concrete (albeit unspecified) actions against Michael because of his Jewish heritage. See Webster's Third New International Dictionary 1685 (1993) (word "persecute" means "to cause to suffer . . . because of belief [as in a religion]"). "There was neither imprecision in meaning nor anything in the context of the [statements] that suggested that [the statements were] not factual." See *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 717 (1987).

The plaintiffs also submitted evidence that Michael had made his statements to Cason in circumstances where Cason would reasonably believe that they had been uttered after Michael had had time for thought, and were deliberately intended to convey a serious charge of discrimination against Piper. Contrast *Ward* v. *Zelikovsky, supra* at 538-539 (spontaneous outburst by defendant at meeting of condominium owners that speaker "hates Jews" constituted mere verbal insult not intended to convey defamatory fact). Thus, the plaintiffs submitted evidence that Michael had made his statements to Cason not in response

---

[9]The summary judgment record included an affidavit and deposition testimony of Cason that was consistent with his subsequent trial testimony.

to any provocation from him, but rather as part of a calculated effort joined in by Sumner to dissuade Cason from continuing to use Piper as Lumina's sales representative on its transaction with Piper. They also submitted evidence that, as a result of Michael's charges, and Sumner's repetition of those charges, Cason telephoned Piper and, after asking her to respond to the charges, actually removed her as Lumina's sales representative on its transaction with Staples.

In view of all the foregoing circumstances, we conclude that Michael's alleged assertions that Piper was anti-Semitic, had told anti-Semitic jokes in his presence, and was constantly persecuting him because of his Jewish heritage constituted assertions of fact, rather than constitutionally protected expressions of opinion. They, therefore, could provide the basis for a defamation claim. See *King* v. *Globe Newspaper Co., supra* at 717, and cases cited. See also *Ward* v. *Zelikovsky, supra* at 531-532 ("The higher the 'fact content' of a statement, the more likely that the statement will be actionable"); *Buckley* v. *Littell,* 539 F.2d 882, 884-885 & n.1 (2d Cir. 1976) (statement that journalist had lied about several persons constituted actionable assertion of fact, whereas statement that journalist was "fascist" did not); Restatement (Second) of Torts § 565 (1977).

Moreover, because the statements concerned a characteristic or qualification Piper needed to have to be a successful sales agent, i.e., an ability to deal with, and attract as customers, persons of all religions and ethnic backgrounds, we conclude that they are actionable without proof of any special damages in the form of economic loss or harm. See *Ravnikar* v. *Bogojavlensky,* 438 Mass. 627, 630 (2003). See also Restatement (Second) of Torts § 573 comment c (1977) ("Statements concerning merchants that question their solvency or honesty in business come within the rule stated in this Section [permitting recovery without proof of special harm], as do statements charging any other quality that would have a direct tendency to alienate custom"). Hence, unlike the situation with the intentional interference and c. 93A claims, the plaintiffs were not precluded from proceeding with their defamation claims merely because they could not produce any evidence that they had suffered economic harm as a result of the defendants' conduct. See

*Ravnikar* v. *Bogojavlensky, supra.* We, therefore, conclude that the judge erred in allowing summary judgment dismissing the plaintiffs' defamation claims to the extent they were based on the alleged statements by Michael that Piper was anti-Semitic, had told anti-Semitic jokes in his presence, and had constantly persecuted him because of his Jewish heritage.

On the other hand, it is well settled that a statement of opinion is nonactionable if it is drawn from a disclosed fact that is either true or nondefamatory, regardless of whether the opinion was justified, so long as the statement does not imply the existence of other, undisclosed facts that are both false and defamatory. See *National Assn. of Govt. Employees, Inc.* v. *Central Bdcst. Corp.*, 379 Mass. 220, 227-228 (1979); *Fleming* v. *Benzaquin*, 390 Mass. 175, 187-188 (1983). Here, it was undisputed that Michael's alleged statement that Piper was prejudiced against homosexuals was based solely on his description of the conversation occurring prior to the meeting on November 27, 1995, in which Piper asked Michael whether Eckstein might have a problem with Cason being gay. The plaintiffs did not deny that this conversation had occurred, or contend that Michael's statement that Piper was prejudiced against homosexuals implied the existence of other, undisclosed facts about Piper that were both false and defamatory. In these circumstances, the judge properly concluded that Michael's statement that Piper was prejudiced against homosexuals constituted nonactionable opinion. See *Lyons* v. *Globe Newspaper Co.*, 415 Mass. 258, 266 (1993).

We also conclude that the judge did not err in holding that the plaintiffs could not recover on their defamation claims to the extent they were based on Sumner's statements that Piper was "sick" and "mentally ill" and "lived with two hundred cats." Viewed in the context in which they were made, these statements could not reasonably have been understood as assertions of actual fact about Piper, as distinct from "rhetorical hyperbole." See *Lyons* v. *Globe Newspaper Co., supra* at 266-267. See also *Bratt* v. *International Bus. Mach. Corp.*, 392 Mass. 508, 516 n.13 (1984). Moreover, it does not appear from the record that the plaintiffs made any claim before the Superior Court judge that the statement that Piper lived with "two

hundred cats" was defamatory. Hence, the judge did not err in concluding that any such statement was nonactionable, even if it could reasonably be understood as an assertion of actual fact about Piper. See *Ravnikar* v. *Bogojavlensky, supra* at 629 n.3.

4. *Dismissal of other claims.* The motion judge dismissed Piper's claim of intentional infliction of emotional distress against the defendants based solely on his determination that the statements they allegedly made to Cason about Piper being anti-Semitic and having persecuted Michael because of his Jewish heritage were constitutionally protected statements of opinion. Because we have concluded that this determination was erroneous, we also conclude that he should not have dismissed this claim. Piper submitted sufficient admissible evidence in opposition to the defendants' motion for summary judgment to warrant jury findings both that the defendants' conduct was extreme and outrageous and that it had a "severe and traumatic effect upon [Piper's] emotional tranquility." See *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 145-146 (1976), quoting from *Alcorn* v. *Ambro Engr., Inc.*, 2 Cal. 3d 493, 498 (1970). See also *Kelly* v. *General Tel. Co.*, 136 Cal. App. 3d 278, 287 (1982) (holding that spreading of deliberately false statements that employee in effect committed forgery constitutes extreme and outrageous conduct).

Also, as a result of the motion judge's dismissal of the plaintiffs' defamation claims, the plaintiffs were precluded from prosecuting their claim of civil conspiracy based on the alleged defamation, as they otherwise would have been permitted to do. See *Kurker* v. *Hill*, 44 Mass. App. Ct. 184, 188-189 (1998). Hence, because we have concluded that the defamation claims were improperly dismissed, the plaintiffs must be allowed a new trial of their claim of civil conspiracy. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 119 (2000) (new trial warranted where issue was submitted to jury on erroneous instructions).

*Conclusion.* The case is remanded for entry of a judgment dismissing the claims of intentional interference and violation of G. L. c. 93A (counts 1-3 and 8 of the complaint and affirming the judgment on the duty of loyalty claim (count 4 of the complaint). The judgment dismissing the claims of defamation

and intentional infliction of emotional distress (counts 5 and 6 of the complaint) is vacated and the claims shall be reinstated for further proceedings consistent with this opinion. A new trial shall also be held on the claim of civil conspiracy (count 7 of the complaint).

*So ordered.*