NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-161                                          Appeals Court


    JON BUTCHER  vs.  UNIVERSITY OF MASSACHUSETTS & others.[1]


                      No. 17-P-161.

    Suffolk.     April 11, 2018. - September 17, 2018.

        Present:  Milkey, Maldonado, & Wendlandt, JJ.


Practice, Civil, Summary judgment.  Libel and Slander.
    Newspaper.  Damages, Libel.  Emotional Distress.


    Civil action commenced in the Superior Court Department on
January 21, 2014.

    The case was heard by Douglas H. Wilkins, J., on motions
for summary judgment.


    Jon Butcher, pro se.
    Jean M. Kelley for the defendants.


    WENDLANDT, J.  This case presents the issue whether, in the

absence of any official government action, the fair reporting

privilege extends to a newspaper's publication of a witness's

statement to police.  The plaintiff, Jon Butcher, filed this

_____

    [1] Keith Motley, Winston Langley, Patrick Day, James Overton,
Donald Baynard, Paul Parlon, Shira Kaminsky, Paul Driskill, Cady
Vishniac, and Brian Forbes.

defamation action against the University of Massachusetts
(UMass), a number of its employees (university defendants), and
other individuals associated with its student newspaper
(newspaper defendants),[2] after the newspaper published articles
reporting that he allegedly had taken photographs of women
without their permission on the campus of the University of
Massachusetts-Boston (UMB).  We hold that, prior to the
commencement of official police action, the newspaper's
publication of a witness's allegations to police officers was
not protected by the fair reporting privilege.  We thus reverse
the Superior Court judge's allowance of summary judgment as to
Butcher's defamation claim against the defendant Cady Vishniac.
We also reverse the allowance of summary judgment on Butcher's
intentional infliction of emotional distress claim against
Vishniac.  We otherwise affirm the judgment.

Background.  "We recite the facts in the light most
favorable to the plaintiff."  Ravnikar v. Bogojavlensky, 438
Mass. 627, 628 (2003).  The allegedly defamatory publications

---

[2] The newspaper defendants are Shira Kaminsky, Paul
Driskill, and Cady Vishniac.  The defendants assert that
Butcher's claims against Kaminsky and Driskill have been
dismissed because they were not served with the summons and
complaint.  The Superior Court docket reflects neither any proof
of service nor a dismissal as to Kaminsky and Driskill.  On
appeal, Butcher does not address the status of service as to
them.  Pursuant to Mass. R. Civ. P. 4 (j), as appearing in 402
Mass. 1401 (1988), the time limit for service of the summons and
complaint has expired.

concern an incident -- the details of which are disputed -- that took place at the John F. Kennedy Massachusetts Bay Transportation Authority station (JFK station) on the morning of March 13, 2013.  At the time, Butcher worked as a security engineer in the information technology department at UMB, and regularly rode a shuttle bus from JFK station to campus.

That morning, the records of the UMB police department reflect that a UMB police officer responded to a report of suspicious activity that had taken place at JFK station.  The officer arrived at the UMB campus and met with a bus driver for the private company that provided the shuttle service.  The bus driver stated that he had observed Butcher taking photographs of women on the bus.  The bus driver explained that he confronted Butcher, and Butcher responded by attempting to hide his face with a newspaper.  Before exiting the bus, Butcher photographed the bus driver, and the bus driver photographed Butcher.  The bus driver sent the officer his photograph of Butcher.

Following this report, Butcher, under the assumed name "Eric Jones," sent an electronic mail message (e-mail) to the UMB public safety department regarding the incident, and provided a different version of events.  In the e-mail, Butcher indicated that the bus driver had falsely accused him of taking photographs of people on the bus, and then had become very hostile toward him.  Butcher explained that the bus driver began

taking photographs of him and then physically blocked him when he tried to exit the bus.  Butcher stated that he took photographs of the bus driver so that he could report the incident.

Sometime after the UMB officer met with the bus driver, the UMB student newspaper published an excerpt from the UMB police blotter regarding the incident:

> "A suspicious white male in a black jacket took photographs and video of nearby women, as well as some buildings on campus.  A witness stated that the party did not appear to be a student and was not wearing a backpack.  The witness snapped a photograph of the suspect and shared that photograph with Campus Safety[.]  Officers tried to locate the suspect at JFK/UMass Station, but could not find him."

Subsequently, on March 25, 2013, the newspaper published an article on its Web site, accompanied by a photograph of Butcher provided by the shuttle bus company, and a headline above the photograph stating, "Have You Seen This Man?"  The article provided additional details regarding the incident covered in the police blotter:

> "On the morning of March 13, the man in the photograph allegedly walked around the UMass Boston campus snapping pictures of female members of the university community without their permission.  According to the student who reported him, he did not appear to be a student as he was not carrying a backpack.  If you see him, please call Campus Safety at 617-287-7780."

Additionally, in its March 26 through April 9 print version, the newspaper published the same article as the one appearing on the

Web site, this time accompanied by two photographs of Butcher, under the same headline, "Have You Seen This Man?"

According to UMB police records, on March 27, after publication of these articles, two of the named university defendants, Detective Paul Parlon and Captain Donald Baynard of the UMB police department, met with Butcher to discuss the incident at JFK station.  When they informed him that the UMB student newspaper had published his image along with the above described allegations, he became incensed.  They then asked him whether he had taken photographs at the JFK station, to which he responded, "I take pictures of everything.  I was taking pictures of the amount of buses and the structural area."  He further stated that on that day he had been photographing "the sun and the flowers or something."  He also explained that he had sent his earlier e-mail using the Eric Jones alias because he values his privacy, did not want to create problems at his workplace, and wanted to remain anonymous.  At the conclusion of the meeting, Baynard and Parlon took possession of Butcher's UMass cellular telephone (cell phone) over Butcher's protests.  Examination of the "Micro SD card" from the cell phone did not reveal any photographs of women from the day of the incident at the JFK station.  The only photographs from that day were of buses and bus drivers at the JFK station.

In the months following the newspaper's publication of the above described articles, Butcher became distressed as he believed that he faced hostility on campus. He believed that people he passed on campus stared at him with fear and loathing. He also began walking from the JFK station to campus instead of taking the shuttle because the bus drivers would stare at him and kept copies of the newspaper articles regarding Butcher open on their dashboards. The campus environment made him fear both for his safety, and for the safety of his family.

Additionally, Butcher faced negative consequences at his workplace in the UMB information technology department. His relationship with the defendant Brian Forbes, his supervisor, deteriorated after the publications. For example, he was no longer given the opportunity to attend trainings regarding campus network security and implementation of new campus technology, and he was also removed from ongoing information technology department projects. In addition, he was given a higher volume of low-level assignments, including being tasked with responding to simple computer security inquiries from campus employees. Eventually, the stress, fear, and negative work environment caused Butcher to decide to leave his job, forfeiting his pension and benefits package. Although his current salary is higher than at UMB, he has less paid vacation time, sick time, and personal days.

Procedural history.  In January, 2014, Butcher filed the present action in Superior Court, asserting six claims arising from the aforementioned publications:  (1) defamation (against all defendants); (2) "declaratory judgment" (against all defendants); (3) "direction under false pretense" (against Forbes); (4) "illegal seizure without probable cause" (against Baynard and Parlon); (5) workplace retaliation (against Forbes); and (6) "emotional distress" (against all defendants).  A Superior Court judge allowed the defendant Patrick Day's motion to dismiss as to all counts of the complaint, describing Day's motion as "without opposition"; allowed UMass's and the university defendants' motion to dismiss as to all counts[3] except the claim for intentional infliction of emotional distress;[4] and allowed Vishniac's motion to dismiss as to all counts except the defamation and intentional infliction of emotional distress claims.  A different Superior Court judge then allowed the

_____

[3] The judge allowed UMass's and the university defendants' motion to dismiss the defamation claim on the ground that the complaint did not plead any role they played in the publication of the articles and photographs.

[4] Butcher raises no argument on appeal regarding the dismissal of the other counts or the dismissal of all counts against Day.  Accordingly all such arguments are waived.  See U.S. Bank Nat'l Ass'n v. Schumacher, 467 Mass. 421, 426 n.10 (2014) (argument not addressed on appeal is waived); Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975) ("The appellate court need not pass upon questions or issues not argued in the brief").

remaining defendants'[5] motion for summary judgment on the remaining counts, and entered final judgment for all the defendants.

Discussion. We review the motion judge's allowance of summary judgment de novo to determine whether "there is [a] genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law" (quotation omitted). Dulgarian v. Stone, 420 Mass. 843, 846 (1995). See Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). "The party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case" (quotation omitted). Dulgarian, 420 Mass. at 846.

1. Defamation. To establish a claim for defamation, a plaintiff must prove four elements: (1) the defendant made a false statement to a third party, (2) of or concerning the plaintiff, (3) that was capable of damaging the plaintiff's reputation in the community and that caused the plaintiff economic loss or is actionable without proof of economic loss, and (4) the defendant was at fault. See Ravnikar, 438 Mass. at

---

[5] Vishniac was the only remaining defendant with regard to the defamation claim; Vishniac, UMass, and the university defendants (except Day) were the remaining defendants with regard to the intentional infliction of emotional distress claim.

629-630.  Disposing of a plaintiff's case at the summary judgment stage is "especially favored" in the defamation context because "[a]llowing a trial to take place in a meritless case would put an unjustified and serious damper on freedom of expression. . . .  Even if a defendant in a libel case is ultimately successful at trial, the costs of litigation may induce an unnecessary and undesirable self-censorship." Dulgarian, 420 Mass. at 846-847, quoting King v. Globe Newspaper Co., 400 Mass. 705, 708 (1987), cert. denied, 485 U.S. 940 and 962 (1988).  Despite these policy concerns, however, defendants in defamation cases still must "meet the usual burden under [Mass. R. Civ. P. 56] of demonstrating by evidence 'considered with an indulgence in the plaintiff's favor' the absence of disputed issues of material fact and their entitlement to judgment as a matter of law."  Salvo v. Ottaway Newspapers, Inc., 57 Mass. App. Ct. 255, 259 (2003), quoting Mulgrew v. Taunton, 410 Mass. 631, 633 (1991).

Butcher's defamation claim rests on essentially two publications by the UMB student newspaper:  (i) the excerpt from the police blotter, and (ii) the articles accompanied by the photograph(s) of him that were published on the newspaper's Web site and in its print edition.  He argues that these publications damaged him by falsely branding him as a sexual

predator and, thus, subjected him to a campus and work environment that was so hostile that he was forced to leave.

a. Police blotter.  With regard to the excerpt from the police blotter, Butcher's claim fails as a matter of law because this excerpt bears no indication that it was "of or concerning" Butcher.  The only information identifying the individual referred to in the excerpt was that it was "[a] suspicious white male in a black jacket . . . [who] did not appear to be a student and was not wearing a backpack."  Without more, these "words [cannot] reasonably . . . be interpreted to refer to the plaintiff."  New England Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper Co., 395 Mass. 471, 479 (1985).

b. Articles with photographs.  We turn next to Butcher's claim regarding the articles accompanied by his photographs.[6] Vishniac argues that Butcher cannot show an actionable false statement.  Butcher makes two distinct claims regarding the falsity of the statements made in the published articles.  We address each in turn.

i. Inaccurately reporting the witness's statements. First, Butcher contends that the articles inaccurately reported

---

[6] At the summary judgment stage, Vishniac argues only that Butcher has no reasonable expectation of proving at trial either that the articles contained an actionable false statement, or that he suffered cognizable harm.  Vishniac does not contest that Butcher has sufficiently demonstrated the other two elements of his defamation claim -- namely that these articles were of or concerning Butcher and that there was fault.

the contents of the police reports of the underlying witness allegations.  While there are discrepancies between the police records and the newspaper articles, the articles were "substantially true" accounts of the contents of the police reports.  Reilly v. Associated Press, 59 Mass. App. Ct. 764, 770 (2003).  The essence of Butcher's defamation claim is that the articles stigmatized him as a sexual predator by reporting that he had suspiciously taken photographs of women without their permission.  The portion of the reporting that was inaccurate relative to the police records -- that it was a student, rather than a bus driver, who reported him, and that he took pictures on the campus as opposed to a shuttle bus -- "did not create a substantially greater defamatory sting than [the] accurate report."  Jones v. Taibbi, 400 Mass. 786, 795 (1987).

ii.  Fair report privilege.  Second, Butcher maintains that the underlying witness allegations were themselves false.[7]  Vishniac responds only that the newspaper's publications are protected under the fair report privilege because they communicated the witness statements included in the UMass police blotter.

The fair report privilege protects publications that "fairly and accurately report certain types of official or

---

[7] On summary judgment, Vishniac does not contend that the witness allegations are substantially true.

governmental action" even where the facts underlying the official action are defamatory. ELM Med. Lab., Inc. v. RKO Gen., Inc. 403 Mass. 779, 782 (1989). "For example, '[t]he publication of the fact that one has been arrested, and upon what accusation, is not actionable, if true," even where the accusations turn out to be false. Jones, 400 Mass. at 795, quoting Thompson v. Globe Newspaper Co., 279 Mass. 176, 188 (1932). This privilege is grounded in the policy that "(1) the public has a right to know of official government actions that affect the public interest, (2) the only practical way many citizens can learn of these actions is through a report by the news media, and (3) the only way news outlets would be willing to make such a report is if they are free from liability, provided that their report was fair and accurate." Yohe v. Nugent, 321 F.3d 35, 44 (1st Cir. 2003), quoting ELM Med. Lab., Inc., 403 Mass. at 782.

Here, the police made no arrest, no formal charges were filed, there was no official police statement, and no search warrant was issued.[8] In these circumstances, the Supreme

---

[8] Contrast Thompson v. Boston Publ. Co., 285 Mass. 344, 346-347 (1934) (report of allegations on which plaintiff was arrested after warrant was issued was privileged); Sibley v. Holyoke Transcript-Telegram Publ. Co., 391 Mass. 468, 471 (1984) (publication of statements contained in affidavit for search warrant, which later issued, covered under privilege); Jones, 400 Mass. at 795-797 (report that suspect had been charged with

Judicial Court has explained that "'statements made . . . by the complainant or other witnesses . . . as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceedings or of the arrest itself and are not privileged . . . .' Restatement (Second) of Torts § 611 comment h (1977). Accordingly, '[t]here is also no privilege to report the unofficial talk of such officials as policemen, as distinct from their official utterances or acts, such as an arrest' . . . . W. Prosser & W. Keeton, [Torts § 112,] at 836 [(5th ed. 1984)]." Jones, 400 Mass. at 796. Thus, the fair report privilege "does not apply to witness statements to police, whether appearing in an official police report or not, where no official police action is taken." Reilly, 59 Mass. App. Ct. at 776. Such unconfirmed allegations have "neither the authority nor the importance to the public that other documents or statements shielded by the fair reporting privilege possess." Id. Extending the privilege to a witness's allegations merely because they appear in a police blotter does not further the doctrine's purpose of allowing the public to learn of official actions affecting the public interest. See id. at 777. See also Philips v. Evening Star Newspaper Co., 424 A.2d 78, 89 (D.C. 1980) (reporting on events documented in police activity

---

crime, and broadcast of police chief's statements made during official press conference, both protected by privilege).

log not privileged because, where there was no arrest, log did not "carry the dignity and authoritative weight as a record for which the common law sought to provide a reporting privilege"). Contrast Medico v. Time, Inc., 643 F.2d 134, 141-142 (3d Cir. 1981) (allegations in nonpublic, but official, Federal Bureau of Investigation investigatory reports submitted by Philadelphia field office qualified for privilege). In the circumstances of this case, the privilege does not apply.[9]

iii. Damages. Vishniac alternatively contends that summary judgment was proper because Butcher has no reasonable expectation of proving at trial that he has suffered a cognizable harm. "Damages in a defamation case are limited to actual damages, which are compensatory for the wrong that has been done." Draghetti v. Chmielewski, 416 Mass. 808, 815 (1994). These damages include "not only out-of-pocket expenses, but also harm inflicted by impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." Id. at 815-816, citing Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 861 (1975). When there is

_____

[9] The inapplicability of the fair report privilege here, of course, does not necessarily mean that there is liability for the newspaper's publication of any statements shown to be false. As set forth supra, Butcher must prove each element of the defamation claim, including fault, which "varies between negligence (for statements concerning private persons) and actual malice (for statements concerning public officials and public figures)." Ravnikar, 438 Mass. at 630.

evidence of mental suffering, "the plaintiff is entitled to recover for the 'distress and anxiety which may have been the natural result of the legal wrong.'" Shafir v. Steele, 431 Mass. 365, 373 (2000), quoting Markham v. Russell, 12 Allen 573, 575 (1866).

The record is sufficient to allow the trier of fact to reasonably conclude that Butcher has suffered actionable harm. Butcher testified that, after the articles were published, he faced a hostile campus that caused him mental distress and made him fear for his safety and the safety of his family. He also testified that, as a consequence of the articles, he lost the trust of his supervisor in the information technology department, and he was thus given less responsibility and handed a higher volume of lower-level work. He testified that he was compelled to leave his job, forfeiting a pension and benefits package.[10] These harms stem from the defamatory publication that branded him a possible sexual predator to the campus community. Thus, Butcher has provided sufficient evidence of mental

---

[10] For purposes of summary judgment, Butcher provides sufficient evidence that the campus environment and conditions of his employment became so hostile that he felt compelled to leave. See GTE Prods. Corp. v. Stewart, 421 Mass. 22, 34 (1995) (under theory of constructive discharge, employee may recover damages against employer even if employee leaves voluntarily where "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign" [quotation omitted]).

suffering, reputational harm, and economic loss to sustain an actionable claim for defamation. See Draghetti, 416 Mass. at 816 (sustaining jury award of damages to plaintiff where he testified that he suffered emotional distress, was ridiculed at work, and had marital problems due to defendant's defamation).

2. Intentional infliction of emotional distress.[11] Butcher's intentional infliction of emotional distress claim is premised on the same factual bases as his defamation claim. To sustain such a claim, a plaintiff must prove "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it"[12] (citations and quotations omitted). Agis v.

---

[11] Butcher has not asserted a claim for negligent infliction of emotional distress.

[12] Because UMass is statutorily immune, summary judgment properly entered in favor of UMass as to Butcher's intentional infliction of emotional distress claim. See G. L. c. 258, § 10 (c); Lafayette Place Assocs. v. Boston Redev. Auth., 427 Mass. 509, 533-535 (1998), cert. denied, 525 U.S. 1177 (1999). See also Robinson v. Commonwealth, 32 Mass. App. Ct. 6, 9 (1992) ("[T]he University of Massachusetts is an agency of the

Howard Johnson Co., 371 Mass. 140, 144-145 (1976). A plaintiff faces a high burden in making a claim of intentional infliction of emotional distress; "[l]iability cannot be predicated on 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997), quoting Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987).

Putting, as we must, "as harsh a face on [Vishniac's] actions . . . as the basic facts would reasonably allow," Richey v. American Auto. Ass'n, Inc., 380 Mass. 835, 839 (1980), a trier of fact could reasonably find that the publication both online and in print of Butcher's photographs alongside allegations that he was surreptitiously photographing women on campus was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 comment d (1965). See Tech Plus, Inc. v. Ansel, 59 Mass. App. Ct. 12, 26 (2003) (jury permitted to find extreme and outrageous conduct where defendant made multiple statements to his colleagues that

Commonwealth under G. L. c. 258"). We also agree with the university defendants that summary judgment as to this claim should enter as to them because, as with the defamation claim, none of the university defendants is alleged to have been responsible for the publication giving rise to the claim. See note 3, supra. This claim is potentially viable only against the remaining newspaper defendant, Vishniac. See note 2, supra.

plaintiff, fellow colleague, had engaged in anti-Semitic and homophobic behavior in the past).

Conclusion.  So much of the judgment as relates to the defamation and intentional infliction of emotional distress claims against Vishniac is reversed.  In all other respects, the judgment is affirmed.

So ordered.