MARK T. REILLY *vs.* THE ASSOCIATED PRESS & others.[1]

No. 01-P-1619.

Barnstable. March 5, 2003. - October 31, 2003.

Present: PORADA, SMITH, & CYPHER, JJ.

*Libel and Slander. Newspaper. Practice, Civil,* Summary judgment.

In an action for defamation arising out of the publication of a newspaper story, the judge erred in granting summary judgment in favor of certain defendants (a newspaper, its reporter, and its editor), where the plaintiff established issues of material fact whether those defendants made false statements of fact to third parties of and concerning the plaintiff [769-778]; where the statements were capable of a defamatory meaning [778]; where disputed issues of material fact existed whether those defendants negligently published the story without first calling the plaintiff to clarify certain statements or alerting readers that some of the facts in the story were disputed [778-779]; and where not only were the statements of a kind that was actionable without proof of actual damages, but the plaintiff also offered evidence of actual damages in the form of economic damages and emotional suffering [779].

In an action for defamation arising out of the publication of a newspaper story, the judge properly granted summary judgment in favor of a wire service, where the story, which the wire service republished from a reputable news source, was not inherently implausible, improbable, or inconsistent. [779-781]

CIVIL ACTION commenced in the Superior Court Department on May 6, 1998.

The case was heard by *Richard F. Connon,* J., on motions for summary judgment.

---

[1]The Boston Herald, Inc. (Herald); Patrick J. Purcell, the publisher of the Herald; Tom Mashberg, a Herald reporter; Andrew F. Costello, a Herald editor; Enterprise Publishing Co., Inc.; Marjorie Clapprood; and American Radio Systems, Inc. Summary judgment was entered as to all of the defendants, but the plaintiff advances arguments in his brief regarding only the Herald; its publisher, reporter, and editor; and the Associated Press. We affirm the grant of summary judgment in favor of Patrick J. Purcell without further discussion. There is no evidence that Purcell had any control over or knowledge of the contents of the allegedly defamatory article at issue in this case or of the editorial process. See *Lyon* v. *Morphew,* 424 Mass. 828, 833 (1997).

*Edward M. Reilly (John L. Kerr* with him) for the plaintiff.

*M. Robert Dushman* for Boston Herald, Inc., & others.

*Hilary Lane (Michael G. Bongiorno* with her) for The Associated Press.

CYPHER, J. The plaintiff, Mark T. Reilly, a veterinary doctor, appeals from an order of the Superior Court granting the defendants' motions for summary judgment and dismissing his complaint for defamation. Reilly filed the complaint in response to certain print and broadcast media publications, including an article that was published on May 21, 1995, on the front page of the Sunday edition of the Boston Herald (Herald). The Herald story (which we reprint as an Appendix to the opinion) related details regarding Reilly's alleged negligence in caring for a six year old West Highland terrier named Zeke. After the Herald ran the story, The Associated Press (AP) picked it up and released a condensed version of it to its members. For the reasons set forth below, we reverse summary judgment as to the Herald defendants (except for Patrick J. Purcell, see note 1, *supra*) and affirm summary judgment as to the AP.

1. *Facts.* We take the facts in the light most favorable to Reilly and make an independent examination of the record as a whole. See *Dulgarian* v. *Stone,* 420 Mass. 843, 847 (1995); *Ravnikar* v. *Bogojavlensky,* 438 Mass. 627, 628 (2003).

At around 4:00 P.M. on Saturday, October 1, 1994, Reilly, the on-call veterinarian for the Barnstable Animal Hospital, received a telephone call from Erica Palermo, who explained that Zeke, her West Highland terrier, had been vomiting since noon. Reilly asked her to bring the dog in for an examination, but Palermo refused. At 6:00 P.M., Palermo called again and told Reilly that Zeke was still vomiting. The Palermos agreed to bring Zeke to the hospital, and Reilly saw him at 6:45 P.M.

After the examination, Reilly diagnosed the dog as suffering from pancreatitis and advised the Palermos that Zeke needed intravenous fluids and should be hospitalized. Joseph Palermo stated he could not leave Zeke alone overnight. Reilly then administered subcutaneous vitamins and fluids and instructed the Palermos to withhold food for the next twenty-four hours. Reilly further instructed the Palermos to feed Zeke a bland diet after the twenty-four hours had passed. Reilly could not order

blood tests as there was no technician on duty at the time to help him draw the blood and the courier services were closed.

That night, the Palermos paged Reilly two more times. In the first call, at 9:00 P.M., they informed him that the dog's temperature was 103 degrees and that he was still vomiting. Reilly offered to hospitalize the dog but again Joseph Palermo refused. In the second call, at around midnight, they informed Reilly that Zeke's temperature was 104.2 degrees but that the vomiting had stopped. Reilly told the Palermos that the lack of vomiting was a good sign and that if the Palermos wanted to have the dog monitored, they should hospitalize him instead of calling every few hours.

The next day, at approximately 8:00 A.M., Reilly called the Palermos to check on Zeke's condition. Joseph Palermo stated that Zeke was fine and that the vomiting had stopped. Reilly, who was the only horse veterinarian on call on Cape Cod that weekend, then told Palermo that he often received horse calls on Sunday and might not be immediately available but that, if need be, he could be paged through an answering service.

Sunday was Reilly's day off. After taking care of the animals at the hospital, Reilly returned home, read the newspaper, and then left to play a round of golf with his father, brother, and coworkers. While on the golf course, Reilly kept his pager and cell phone on his person. At noon, the Palermos called Reilly's answering service and left a message stating that Zeke seemed well and that he was eating. Thus, the Palermos had disregarded Reilly's orders from the previous day which were not to feed the animal for twenty-four hours. About thirty to forty-five minutes later the Palermos called again. Reilly immediately returned their page, and the Palermos informed him that Zeke was acting "mopey." They agreed to meet Reilly at the hospital at 2:15 P.M. or 2:30 P.M. (the exact time is in dispute).

Zeke walked into the appointment and slept on the examining table. During the ninety-minute examination, Reilly took X-rays from four different views and gave the dog subcutaneous fluids and vitamins, an injection of amoxicillin, and an injection of cimetidine. Reilly concluded again that the dog was suffering from pancreatitis. He explained the disease to the Palermos and instructed them, as he had done previously, not to feed Zeke.

He gave them a pamphlet, special food, and a prescription for antibiotics. Reilly again offered to hospitalize Zeke, but again the Palermos refused. Reilly then told the Palermos that, unlike the Barnstable Animal Hospital, the South Shore Veterinary Associates (SSVA) in Weymouth provided twenty-four hour monitoring for animals.

At 8:30 P.M., the Palermos called Reilly again, and Reilly recommended that they take Zeke to SSVA. About an hour and one-half later, the Palermos arrived at SSVA. Zeke died shortly after their arrival there. The Palermos refused to have an autopsy performed on Zeke.

The Palermos promptly filed a malpractice suit against Reilly and a complaint with the Board of Registration in Veterinary Medicine (the board). The board conducted an informal hearing in March 1995. On May 15, 1995, the board issued a letter to Reilly stating it had found grounds to refer the case to the Division of Registration's legal unit to initiate formal disciplinary action.

Pursuing their cause in the court of public opinion, the Palermos contacted a number of local papers, several of which ran the story. Eventually, the Herald too showed interest in the story. Meanwhile, Reilly, having heard that the Herald might write a story, called the newspaper and told his version of events to Jack Sullivan, an editor. In response to Reilly's request to be interviewed, Sullivan told Reilly that the Herald always reported both sides of an issue and that, in any event, the Herald did not plan to run a story about Zeke. Sullivan assured Reilly that if the Herald did write a story, then someone from the newspaper would contact Reilly for an interview.[2]

On May 21, 1995, shortly after Reilly contacted the newspaper, the Herald published the story about Zeke's death that prompted this lawsuit. The reporter did not contact Reilly for an interview. The story's headline, "Bereaved pet owners doggedly seek justice," aptly sums up the flavor of the piece. The inside subheadline further exclaimed: "Vet played golf instead of treating dog." The article also reported that Zeke's

---

[2]Months previously, the reporter had called Reilly's lawyer, but he made no further effort to speak with Reilly before writing the story. The reporter did not attempt to contact Reilly directly.

medical records had "disappeared" from SSVA. These included records from the Barnstable Animal Hospital, which had been sent over to SSVA sometime after Reilly treated Zeke. The records were later found "misfiled" and (in Mr. Palermo's words, as quoted in the article) "doctored to imply that Reilly made a more complete diagnosis on the first day of Zeke's illness." The article quoted a source stating that no one knew what had happened to the records but that Reilly once had interned at SSVA. The article further reported that the Palermos and SSVA received threatening telephone calls regarding the case from an unidentified individual.

Reilly claims that, as a result of the story, his professional reputation throughout the Cape Cod community has been shattered. He received threatening telephone calls, lost clients, and lost his job at the Barnstable Animal Hospital.

On June 6, 1996, the board dismissed the charges against Reilly after concluding that there was insufficient evidence that Reilly had committed either malpractice or misconduct. The board issued a letter of warning to Reilly stating that in the future, he should order prompt laboratory tests and provide aggressive fluid therapy.

On this essential core of facts, the motion judge granted summary judgment for the media defendants.

2. *Discussion.* "[The] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Dulgarian* v. *Stone*, 420 Mass. at 846, quoting from *Symmons* v. *O'Keeffe*, 419 Mass. 288, 293 (1995). With regard to the Herald, its reporter, and its editor, the Superior Court judge concluded that there were no disputed issues of material fact and that Reilly failed to meet his burden of proof as to defamation for any of the statements in the article. The judge also granted summary judgment in favor of Patrick J. Purcell, the publisher of the Herald. With regard to the AP, the judge concluded that the reverse wire defense protected the AP from Reilly's complaint. We examine the claims regarding each defendant.

A. *The Herald, its reporter, and its editor.* To withstand the

Herald's summary judgment motion, Reilly needed to show evidence establishing disputed issues of material fact that (1) the Herald made a false statement or statements "of and concerning" Reilly to a third party; (2) the statement or statements could damage Reilly's reputation within the community; (3) the Herald was negligent in making the statement or statements[3]; and (4) the statement caused economic harm or is actionable without proof of economic harm. See *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. 471, 474 (1985); *Ravnikar* v. *Bogojavlensky*, 438 Mass. at 629-630. See also *Yohe* v. *Nugent*, 321 F.3d 35, 40 (1st Cir. 2003); Restatement (Second) of Torts § 558 (1977).

1. *False statements.* We identify and discuss five express or implied allegations made in the article that a jury could find were false statements of fact: (a) Reilly was an incompetent veterinarian; (b) Reilly played golf instead of treating Zeke; (c) Reilly initially lied to the Palermos about playing golf; (d) Reilly stole Zeke's medical records and then altered them ("doctored" was the Herald's word); and (e) Reilly made threatening telephone calls to the Palermos and to the clinic. The article commented on a matter of public concern — the possible discipline of a State licensed veterinarian due to negligent care; therefore, Reilly must show that these statements were capable of being proved false. See *Jones* v. *Taibbi*, 400 Mass. 786, 797 (1987); *Friedman* v. *Boston Broadcasters, Inc.*, 402 Mass. 376, 381-382 (1988); *Shaari* v. *Harvard Student Agencies, Inc.*, 427 Mass. 129, 132 (1998); *Salvo* v. *Ottaway Newspapers, Inc.*, 57 Mass. App. Ct. 255, 259 (2003). The Herald claims that Reilly has no reasonable expectation of proving certain of the offending statements false because they are either matters of personal opinion or substantially true.

"The determination whether a statement is one of fact or opinion is generally considered a question of law." *Cole* v. *Westinghouse Bdcst. Co.*, 386 Mass. 303, 309, cert. denied, 459

---

[3]Reilly is not a public figure for whom a claim of defamation would require a showing of actual malice by the defendant. See and compare *Lyons* v. *New Mass Media, Inc.*, 390 Mass. 51, 55-57 (1983). Rather, Reilly is a private figure. See *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 858 (1975). He need only prove the negligent publication of a defamatory falsehood to recover actual damages. *Jones* v. *Taibbi*, 400 Mass. 786, 799 (1987).

U.S. 1037 (1982). In making a determination whether a statement is opinion, a court must "examine the statement in its totality in the context in which it was . . . published." *Lyons* v. *Globe Newspaper Co.*, 415 Mass. 258, 263 (1993), quoting from *Fleming* v. *Benzaquin*, 390 Mass. 175, 180-181 (1983). To elaborate, "[t]he court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Cole* v. *Westinghouse Bdcst. Co.*, 386 Mass. at 309, quoting from *Information Control Corp.* v. *Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980). If "the allegedly libelous remarks could have been understood by the average reader in either sense [i.e., as fact or as opinion], the issue must be left to the jury's determination." *Lyons* v. *New Mass Media, Inc.*, 390 Mass. 51, 59 (1983), quoting from *Myers* v. *Boston Magazine Co.*, 380 Mass. 336, 339-340 (1980).

We must also distinguish between "pure opinion" and an expression of opinion that implies a false assertion of fact. See *Dulgarian* v. *Stone*, 420 Mass. at 849. "[E]xpressions of 'opinion' may often imply an assertion of objective fact." *Id.*, quoting from *Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1, 18 (1990). Only pure opinion based on disclosed nondefamatory facts is protected under the First Amendment. See *Cole* v. *Westinghouse Bdcst. Co.*, 386 Mass. at 311.

Further, a factual statement need not state the precise truth. See *Dulgarian* v. *Stone*, 420 Mass. at 847; *Tartaglia* v. *Townsend*, 19 Mass. App. Ct. 693, 698 (1985). Thus, when a statement is substantially true, a minor inaccuracy will not support a defamation claim.

With these principles in mind, we examine each of the five alleged false statements.[4]

The article suggests that Reilly is an incompetent veterinarian

---

[4]Massachusetts has not recognized the neutral reportage privilege. Hence, the Herald may be held liable for quoted defamatory falsehoods if they were published negligently. *Lyons* v. *New Mass Media, Inc.*, 390 Mass. at 59 n.3. See generally Keyes, Freedom Without Responsibility: Do Massachusetts

who used "an old vets' excuse" of an "emergency horse call" as an excuse for not treating Zeke on that Sunday morning, when in fact he was playing golf. Throughout the article, Palermo gives his opinion that Reilly provided "sloppy," "lazy" treatment and thus caused Zeke's death.[5]

Palermo's general statements regarding Reilly's treatment are protected opinion. The reasonable reader could recognize these statements as generalizations uttered by a distraught pet owner. See *Gonzalez* v. *Gray*, 69 F. Supp. 2d 561, 568 (S.D.N.Y. 1999), aff'd, 216 F.3d 1072 (2d Cir. 2000) ("[a] reasonable viewer would understand that [the defendant's] statements are not statements of fact, but represent the opinion of a distraught widower who recently lost his wife to a terrible illness"). Compare *Kanaga* v. *Gannett Co.*, 687 A.2d 173, 181-182 (Del. Super. 1995) (within context of article, ordinary reader would not know that patient's opinion that doctor's care fell below standard of care was conjecture and hence could be viewed as express or implied misstatement of fact).

Other statements in the article attributed to Palermo regarding the course of Zeke's treatment by Reilly (other than the one that Zeke was "sent home" with the Palermos, which Reilly contends only happened when the Palermos refused his several offers to hospitalize the dog) were essentially true, albeit with possible minor inaccuracies and, so, were not defamatory of Reilly's competence as a veterinarian.[6] See *Dulgarian* v. *Stone*, 420 Mass. at 847. On the other hand, Reilly produced evidence

---

Media Defendants Need the Neutral Reportage Privilege, 34 Suffolk U. L. Rev. 373 (2001).

[5]For example, "Zeke is dead because of lazy treatment." The caption on an accompanying photograph also states, "The [Palermos] believe Zeke . . . died due to neglect by their veterinarian."

[6]The article quotes Palermo as follows:

> " 'He said Zeke had pancreatitis, and that the disease would run its course,' Palermo said. 'He sent us home, but Zeke's temperature kept going way up.' . . . He was not on hand at the hospital until 2:30, by which time, Palermo says, 'Zeke could barely stand.' . . . The vet gave Zeke a shot of ampicillin, an antibiotic, and sent him home, telling the Palermos that it would make no sense to leave the dog overnight in a cage."

that the Palermos refused his multiple offers to hospitalize Zeke. According to Reilly, he only allowed the Palermos to return home after it became clear that they would not leave Zeke alone at the hospital. There is a genuine issue of material fact whether Reilly sent the Palermos home without offering more extensive care for Zeke.

Allegations such as that Reilly played golf and lied about it support opinions about Reilly's competence as a veterinarian and are factual and therefore capable of being proved false. See *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 717 (1987), cert. denied, 485 U.S. 940 and 485 U.S. 962 (1988). Palermo was quoted as saying that "Zeke is dead because of lazy treatment by a vet who decided to play golf instead of doing his job." The article's interior subheadline echoes Palermo's conclusion: "Vet played golf instead of treating dog." The article's text elaborates:

> "At 8 the next morning, Reilly called to say that he had been summoned on an 'emergency horse call.' He said he could see Zeke at noon. The truth, Reilly later admitted, was that he had gone to play golf, using an old vets' excuse."

We view these statements as factual. The statements are un-attributed and are presented not as opinions but as actual events preceding (and possibly contributing to) Zeke's death. Compare *King* v. *Globe Newspaper Co.*, 400 Mass. at 714 (readers expect to read columnist's views and opinion pieces as opposed to factual stories on op-ed page).

Here, the Herald reported that Reilly deliberately neglected his responsibilities to an ailing dog in favor of playing golf. By contrast, Reilly presented evidence that the purpose of his 8:00 A.M. telephone call was to check on Zeke, that he kept his pager on his person, that he promptly returned Palermo's page, and that he and the Palermos agreed upon a 2:15 P.M. appointment time that Sunday. Further, Reilly stated that during his 8:00 A.M. call, Palermo said that Zeke appeared to be convalescing and had stopped vomiting. That statement calls into question whether Reilly knew or should have known that Zeke was ailing when he left for the golf course.

There is evidence from which a jury could find that Reilly was available to the Palermos throughout Sunday. This contradicts the article's assertion that he played golf instead of treating Zeke. Thus, there is a genuine issue of material fact whether Reilly played golf instead of treating Zeke. A jury should be allowed to consider whether the Herald's report on that point was false. See *Friedman* v. *Boston Broadcasters, Inc.*, 402 Mass. at 382. See also *Elder* v. *Cardoso*, 205 Ga. App. 144, 145 (1992) (in action for slander, doctor "either did or did not attend deliveries" or "was or was not available when babies were sick"; such statements are capable of being proved true or false); *Healey* v. *New England Newspapers, Inc.*, 555 A.2d 321, 328 (R.I.), cert. denied, 493 U.S. 814 (1989) (evidence refuted claim that doctor failed to aid dying man, thus creating factual issue whether accusation about doctor was false and published with reckless disregard for truth).

The article further reports that Reilly at first deceived the Palermos to avoid treating Zeke but later "admitted" the truth to them about playing golf. It is undisputed that Reilly played golf that Sunday; but whether he deceived the Palermos is a question for a jury to decide.

An assertion that someone lied to avoid his professional duties can be proved false. See *Milkovich* v. *Lorain Journal Co.*, 497 U.S. at 19 & n.7; *Buckley* v. *Littell*, 539 F.2d 882, 895-896 (2d Cir. 1976), cert. denied, 429 U.S. 1062 (1977) (assertion that journalist lied about and libeled certain people was assertion of fact). Compare *Lyons* v. *New Mass Media, Inc.*, 390 Mass. at 60 (general assertion that plaintiff was "liar" was essentially "epithet" that merely expressed opinion). Here, the Herald pinpoints a specific alleged lie: Reilly said he was treating a horse but actually played golf, which is a statement that a single verifiable event occurred. *King* v. *Globe Newspaper Co.*, 400 Mass. at 717. In contrast to the Herald's statement, Reilly claims he told the Palermos that he "might" be tied up with a horse call (he was the only horse veterinarian on call on Cape Cod that Sunday) but that he was still on call to them and could be paged. He further states that he had discussed golf with his father the previous night, but had decided to play golf only after checking on his patients, including Zeke.

The evidence thus conflicts with the article's statement that Reilly used "an old vets' excuse" to avoid treating Zeke or that he "admitted" (in the context of the article, the word implies a lack of appropriate care) to any such deception. Instead, Reilly asserts that he treated the animals, returned home, and then decided to play golf. He also claims that the interested parties knew without any subsequent "admission" on his part that he had played golf that day. In sum, there is a genuine issue of material fact regarding whether Reilly deliberately deceived the Palermos about his Sunday golf activities. A jury should be able to decide whether the Herald's account of Reilly's alleged deception is false. See *Friedman* v. *Boston Broadcasters, Inc.*, 402 Mass. at 382.

Several of the article's passages are capable of conveying the suggestion or innuendo that Reilly stole, then altered, Zeke's records from SSVA. The article attributes these "facts" to Palermo and to Michael Foley, SSVA's business manager, who said the records had "disappeared" from the files only to turn up "misfiled" several months later. According to Palermo, they were also "doctored to imply that Reilly made a more complete diagnosis on the first day of Zeke's illness."

The existence of defamatory innuendo is a question of fact for a jury to consider. See *Lyman* v. *New England Newspaper Publishing Co.*, 286 Mass. 258, 260-262 (1934); *Sharratt* v. *Housing Innovations, Inc.*, 365 Mass. 141, 143-145 (1974). "[D]efamation can occur by innuendo as well as by explicit assertion. . . ." *Brown* v. *Hearst Corp.*, 54 F.3d 21, 25 (1st Cir. 1995). See *Merrill* v. *Post Publishing Co.*, 197 Mass. 185, 193 (1908). Existence of defamatory innuendo is a question of fact.

Foley's statement insinuates that he suspected Reilly, who had previously worked at SSVA (as a nurse, not as an intern as the article states), was responsible for the missing files. Standing in isolation, the statement suggesting that Foley suspected Reilly as the one responsible for the missing file, but also stating that Foley had "no clue" as to the "cause," is protected opinion based upon the "disclosed nondefamatory fact[]" that Zeke's file at SSVA was missing for a time. See *National Assn. of Govt. Employees* v. *Central Bdcst. Corp.*, 379 Mass. 220, 227-228 (1979), cert. denied, 446 U.S. 935 (1980); *Lyons* v. *Globe Newspaper Co.*, 415 Mass. at 264.

Unlike Foley's statement, however, Palermo's statement that Zeke's records were altered to make Reilly's work look more thorough is factual and therefore capable of being proved false: either a document shows signs of alteration or it does not. The Herald cannot escape liability for a false statement merely because the statement is attributed to Palermo. *Jones* v. *Taibbi*, 400 Mass. at 792. The phrase "Reilly denies this," after Palermo's claim that the records were "doctored," is capable of further suggesting that Reilly was the culprit. Additionally, Palermo's statement about the doctored records serves to confirm Foley's opinion regarding the lost records: it gives factual support to Foley's suspicions. See *King* v. *Globe Newspaper Co.*, 400 Mass. at 717. If the records were altered, as the article claimed, then they could not simply have been inadvertently misfiled. The statement is capable of suggesting nondisclosed defamatory facts, namely, that the records were not misfiled but that Reilly stole them, altered them, and then returned them to the wrong place in the files. Moreover, the word "misfiled," printed with quotation marks, creates the innuendo that the files were not really misfiled but instead were stolen.

In fact, Reilly's records and the Barnstable Hospital's records were always available to the Palermos. Indeed, the Palermos had copies of the records (although the Herald did not report that fact). Thus, a jury could examine the Palermos' copies and compare them to the originals to ascertain whether Palermo's statement about "doctored" records is true. A jury should also be able to consider whether the possibly defamatory insinuation that Reilly stole the records is false.

The article goes on to report that Foley received three anonymous, harassing telephone calls and that Palermo also had received a telephone call from someone who threatened to throw poisoned meat to his dogs. Tellingly, the article reports that Foley filed a police report in which he quoted one anonymous caller as stating: "The dog's dead; stop helping Palermo. I have the records; he has no proof." A jury could reasonably conclude that this statement all but identifies Reilly as the one who stole the SSVA records *and* who made the threatening telephone calls. The article reports that the telephone calls occurred after Palermo had put pressure on Reilly "for answers," and then had

"confronted" him. "An insinuation may be as actionable as a direct statement." *Mabardi* v. *Boston Herald-Traveler Corp.*, 347 Mass. 411, 413 (1964), quoting from *Thayer* v. *Worcester Post Co.*, 284 Mass. 160, 162 (1933). A genuine issue of material fact is presented whether there were defamatory innuendos underlying the passages about the missing records, namely that Reilly stole the records and then made harassing telephone calls to the clinic and to Palermo. See *Brown* v. *Hearst Corp.*, 54 F.3d at 25, citing *Mabardi* v. *Boston Herald-Traveler Corp.*, 347 Mass. at 413. A jury should consider whether the innuendos were made and, if so, whether they were false.

The Herald argues that statements in the article from the police report concerning Zeke's missing records and the harassing telephone calls fall within the fair reporting privilege immunizing from liability those who "fairly and accurately report certain types of official or governmental action." *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 782 (1989). We disagree.

The fair reporting privilege derives from the recognition that the general public has the right to know of official government actions that affect the public interest, that news outlets are the best way to disseminate such information, and that news outlets would be willing to make such reports only if they were free from liability. *Id.* "Whether the occasion was privileged was matter of law to be determined by the judge." *Joyce* v. *Globe Newspaper Co.*, 355 Mass. 492, 498 (1969).

The privilege applies to reports by news media outlets of official government action, including police action, such as the fact of an arrest, a search warrant issued, or a crime charged; but it does not apply to witness statements to police, whether appearing in an official police report or not, where no official police action is taken. Such reports to police are unverified hearsay. See generally *Jones* v. *Taibbi*, 400 Mass. at 795-796, and cases cited. The Herald article reports no police investigation or action following up on Foley's statements in the police report.

Such unconfirmed hearsay, upon which no police action was taken, has neither the authority nor the importance to the public that other documents or statements shielded by the fair report-

ing privilege possess. See *Jones* v. *Taibbi*, 400 Mass. at 797; *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. at 783. An analogy may be drawn between such reports and a preliminary written statement of a charge: "Knowledge of them throws no light upon the administration of justice. Both form and contents depend wholly on the will of a private individual, who may not be even an officer of the court." *Lundin* v. *Post Pub. Co.*, 217 Mass. 213, 215-217 (1914). See *Sanford* v. *Boston Herald-Traveler Corp.*, 318 Mass. 156, 158 (1945). Extending the privilege in this case would not further the public's interest in learning of official conduct. See *McAvoy* v. *Shufrin*, 401 Mass. 593, 598 n.5 (1988). The privilege does not apply here.

Finally, the Herald contends (and the motion judge agreed) that statements in the article about the misfiled or stolen "doctored" records and anonymous telephone calls were not "of and concerning" Reilly because he was not identified in the article as the individual responsible for the reported acts. Again, we disagree.

"[A] plaintiff may establish that the defendant's words were of and concerning the plaintiff by proving at least that the defendant was negligent in publishing words which reasonably could be interpreted to refer to the plaintiff." *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. at 479. See *Eyal* v. *Helen Bdcst. Group*, 411 Mass. 426, 430-431 (1991). One could draw from the various passages about the SSVA records and the anonymous telephone calls that Reilly, the only person identified in the article with interests adverse to the Palermos, had a hand in both. See *ibid.* A defamatory comment is made "of and concerning" the person to whom the reader or recipient, correctly or mistakenly but reasonably, understands it was intended to refer. "While the plaintiff need not prove that the defendant 'aimed' at the plaintiff, he . . . must prove that the defendant was negligent in writing or saying words which reasonably could be understood to 'hit' the plaintiff." *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. at 478.

The allegations of missing, altered records and anonymous threatening telephone calls "hit" Reilly — or so a jury could find. The article's statements about these events were interlaced

with direct references to Reilly, including that he was "pres-sur[ed]" by the Palermos and (as reported near the beginning of the article) that he and the clinic he worked for had "altered or mislaid" Zeke's records and had "stonewalled" the Palermos for months. In short, the statements about the records and telephone calls could reasonably — if perhaps mistakenly — lead an ordinary reader to suspect Reilly.

Thus, Reilly has satisfied by summary judgment standards the first element of his defamation claim by establishing issues of material fact whether the Herald defendants made false statements of fact to third parties of and concerning him. We briefly examine the remaining elements of the defamation claim against the Herald and then examine the claim against the AP.

2. *Defamatory statements.* "The determination whether the communication complained of is capable of a defamatory meaning is for the court." *Jones* v. *Taibbi*, 400 Mass at 792. The statements made in the article are capable of conveying a defamatory meaning. Once the court has determined that a statement is capable of a defamatory meaning, it is for a jury to decide whether the statement was so understood by its recipient. *Ibid.* A jury could find such statements exposed Reilly to public hatred, ridicule and contempt, "discrediting [him] in the minds of any considerable and respectable class of the community." *Disend* v. *Meadowbrook Sch.*, 33 Mass. App. Ct. 674, 675 (1992).

Statements suggesting that one lacks a necessary professional characteristic are defamatory. See *Morasse* v. *Brochu*, 151 Mass. 567, 578 (1890); *Ravnikar* v. *Bogojavlensky*, 438 Mass. at 630. Furthermore, statements about Zeke's misfiled, altered records and about the telephone calls, if a jury found them to impugn criminal conduct by Reilly, are defamatory per se. See *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975); *Jones* v. *Taibbi*, 400 Mass. at 795-796. Thus, the statements are capable of a defamatory meaning.

3. *Negligent publication.* The Herald reporter did not contact Reilly before writing the story and then reported that Reilly "declined to speak publicly." However, Reilly produced evidence that he had contacted the Herald approximately one week before the story was published, asked at that time to be

interviewed, and then told his side of the story to an editor. Reilly's version of events, had it been included in the article, would have included that the Palermos fed Zeke against his orders, that Reilly made himself available to the Palermos while he was on the golf course, and that he had offered several times to hospitalize the dog but that the Palermos had declined the offers. Reilly's side of the story also would have included a denial that he stole Zeke's records, made harassing telephone calls, or altered documents. Thus, disputed issues of material fact emerge as to whether the Herald negligently published the story without first calling a willing source to clarify certain statements or alerting readers that there were disputed facts. See and compare *Friedman* v. *Boston Broadcasters, Inc.*, 402 Mass. at 381-382 (issue of material fact whether broadcaster made sufficient investigation of plaintiff's records before broadcasting defamatory falsehood, where records tended to refute or undercut key facts reported in news story).

4. *Damages.* Statements that prejudice one's professional standing or that charge one with a crime are actionable without proof of actual damages. See *Ravnikar* v. *Bogojavlensky*, 438 Mass. at 630. The article's statements prejudice Reilly's professional reputation and standing; they also come close to suggesting possible criminal activity on his part. Furthermore, Reilly's answers to interrogatories offer evidence of actual damages in the form of economic damages and emotional suffering exacted by the article's publication. Thus, there are questions of fact for a jury on the issue of damages.

To conclude, summary judgment in favor of the Herald defendants (with the exception of the publisher) should not have been granted because Reilly, in his summary judgment materials, has established issues of fact as to each of the four elements of his defamation claim.

B. *The Associated Press.* By contrast, we think summary judgment properly entered for the AP based on the reverse wire service defense, so-called, where the Herald story, which the AP republished, was not inherently implausible, improbable, or inconsistent. In *Appleby* v. *Daily Hampshire Gazette*, 395 Mass. 32, 38 (1985), the Supreme Judicial Court adopted the wire service defense, concluding that "no jury could reasonably find

that a newspaper had acted negligently in relying on the accuracy of a story from a reputable wire service." *Ibid.* The plaintiff in that case sued a number of newspapers that had republished an account of the plaintiff's alleged crimes, using stories obtained from reputable wire services. The court reasoned that requiring a newspaper to verify the content of stories obtained through reputable wire services "would impose a heavy burden on the media's ability to disseminate newsworthy material." *Ibid.* The court further noted that the wire service stories relied upon were not "inherently improbable or inconsistent" so as to give the newspapers reason to doubt their accuracy, and that the defendant newspapers had no reason to know of facts extraneous to the stories that would raise doubts as to the stories' accuracy. *Id.* at 40. We believe this reasoning is equally applicable when a wire service picks up a news story from a reputable newspaper or other media outlet member of its service. See *Winn* v. *Associated Press*, 903 F. Supp. 575, 579 (S.D.N.Y. 1995), aff'd, 104 F.3d 350 (2d Cir. 1996); *Winn* v. *United Press Intl.*, 938 F. Supp. 39, 44-46 (D.D.C. 1996). See also *Nelson* v. *Associated Press, Inc.*, 667 F. Supp. 1468, 1478-1480 (S.D. Fla. 1987).

To an extent, the AP and its member newspapers and other media outlet members share a symbiotic relationship: the AP employs its own staff to research and write original news wire stories but also frequently relies upon member newspapers as additional wire sources. The same applies to the AP's member newspapers. While the AP's resources may be greater than a small local newspaper's, it cannot afford to verify every news item originating from every one of its member publications and still disseminate news promptly. See *Appleby* v. *Daily Hampshire Gazette*, 395 Mass. at 38-39; *Winn* v. *Associated Press*, 903 F. Supp. at 579. To operate efficiently, newspapers must be able to trust wire services, and wire services must be able to trust newspapers for original, nonwire service generated material. For purposes of the reverse wire service defense, we draw no distinction between fast-breaking news stories of national or international import and local, human interest or news features, arguably concerning "lesser" events. It would pose an impermissible burden upon the media and the courts to force

them to make subtle distinctions between published material that must be independently verified and that which does not. See *Appleby* v. *Daily Hampshire Gazette*, 395 Mass. at 39-40.

The Herald is recognized as a reputable news source. Nothing on the face of the article appears "inherently improbable or inconsistent." The article at least appears accurate and adequately researched. Hence, the AP was not negligent in republishing it.

The responsibility for accurate, nondefamatory reporting lies with the newspaper that published the original story, not with the wire service that "demonstrated ordinary care in preparing and transmitting the article." *Winn* v. *Associated Press*, 903 F. Supp. at 580. Thus, Reilly's claims for defamation lie with the Herald, not with the AP.

3. *Conclusion.* There are genuine issues of material fact that we have discussed as to the truth or falsity of various factual statements in the article. Reilly produced evidence suggesting that he did not (1) play golf instead of treating Zeke, (2) lie to the Palermos about it, (3) make threatening telephone calls, or (4) steal or alter documents. Because Reilly may be able to prove that certain statements in the article were negligently published defamatory falsehoods, we reverse summary judgment as to the Herald. We affirm summary judgment as to the AP.

*So ordered.*

APPENDIX.

Bereaved pet owners doggedly seek justice.

By Tom Mashberg

Joe and Erica Palermo were determined not to take their beloved Zeke's death lying down, even after the doctors and bureaucrats insisted in writing that nothing could have been done to save the little guy.

But when you're a childless couple and you adore your four pets like doting parents — and you believe that the medical care you paid good money for was uncaring and incompetent — you're like a dog on a bone: You don't give up.

Not until the animal clinic and the veterinarian in question have been

forced to admit that they bungled the case, altered or mislaid the documents, and stonewalled you and your lawyers for months.

When you're Erica and Joe Palermo of East Falmouth, you love your West Highland terriers like children, and you don't want fellow dog owners to go through what you did.

"This should never happen to another pup — Zeke is dead because of lazy treatment by a vet who decided to play golf instead of doing his job," said Joe Palermo, 46, who owns an Italian specialty shop in Hatchville. "He was so special, our little guy."

The veterinarian on the hot seat, Mark T. Reilly, 31, of Barnstable, has declined to speak publicly on the case, and so has Barnstable Animal Hospital, where Reilly works. Reilly has stated in court papers that he did no wrong.

But this past Monday, the Massachusetts Board of Registration in Veterinary Medicine, the state oversight panel that heard the Palermo case in mid-March, ruled that "the board finds grounds to refer this case to the Division of Registration Legal Unit to initiate formal disciplinary action" against Reilly. Action is pending.

Zeke's case began last Oct. 1, a Saturday, when the 6-year-old pooch began ailing and then throwing up. At 4 p.m., the Palermos phoned Barnstable Animal Hospital, a clinic that had long cared for their four terriers.

Their usual vets, co-directors David Romeiser and John Leach, were not on duty, but Reilly, whom they did not know, advised them to withhold feeding for 24 hours. Things worsened, however, and by 6 p.m. the Palermos took Zeke in to see Reilly.

"He said Zeke had pancreatitis, and that the disease would run its course," Palermo said. "He sent us home, but Zeke's temperature kept going way up."

Palermo called Reilly twice more that night, at 9 p.m. and midnight, to say Zeke's temperature was 105.6 — 3.6 degrees above normal. Reilly urged him not to worry; he said he would see Zeke in the morning.

At 8 the next morning, Reilly called to say that he had been summoned on an "emergency horse call." He said he could see Zeke at noon. The truth, Reilly later admitted, was that he had gone to play golf, using an old vets' excuse. He was not on hand at the hospital until 2:30, by which time, Palermo says, "Zeke could barely stand."

By now, Palermo said, the mood had soured between him and Reilly. The vet gave Zeke a shot of ampicillin, an antibiotic, and sent him home, telling the Palermos that it would make no sense to leave the dog overnight in a cage.

"I trusted this hospital not to have a doctor on duty who couldn't handle things," Palermo said. "I do wish I'd taken Zeke to another hospital sooner."

It was Reilly, during a final phone call at 9:30 that evening, who asked Palermo to go to South Shore Veterinary Associates in Weymouth. "Zeke died in the waiting room there at 10," Palermo said. "It ripped us apart."

Palermo says the doctors at South Shore told him that Zeke had a massive septic infection that required huge doses of antibiotics to control. They said a blood test should have been taken sooner.

Determined to pressure Reilly for answers, the Palermos requested the medical records on Zeke from South Shore as the first step in a $50,000 lawsuit. South Shore had received the final records on Zeke from the Barnstable clinic.

Instead, the Palermos met with eerie events that left them convinced that skulduggery was afoot.

Michael Foley, business manager at South Shore, told Palermo that Zeke's records had "disappeared" from his office files.

Yet Foley also filed a report with the Weymouth Police stating that he had received three anonymous phone calls, each saying: "The dog's dead; stop helping Palermo. I have the records; he has no proof."

In his statement, Foley said he had no clue as to a source of the calls, or any cause for the lost record, but that "Dr. Mark Reilly, who is being investigated, used to work at South Shore when he was an intern."

The Palermos also received an anonymous call from someone threatening to "toss poisoned meat" to their surviving dogs.

Palermo says he urged his lawyer, Gregory M. Downs of Sandwich, to pursue the lawsuit, and at a mid-March session before the State Registry Department, he and Reilly confronted each other.

"It was there he admitted that he played golf that day," Palermo said. "But he still insisted that his diagnosis was on target, and there of course was no proof either way."

Several Massachusetts vets also attended the proceedings, which were presided over by Dr. Edward A. Leonard, chairman of the veterinary board. Palermo was told by the registration panel to await a ruling within a year.

Frustrated, Palermo publicized a $1,000 reward for Zeke's lost medical records, and Foley added an offer of a day off for any South Shore staffer who might find them. In early May, Foley says Zeke's records turned up — "misfiled" at South Shore.

Palermo says those records were doctored to imply that Reilly made a more complete diagnosis on the first day of Zeke's illness. Reilly denies this. In any event, once the missing records were forwarded to the state overseers, in early May, they sped up their ruling, issuing the May 15 letter promising "formal disciplinary action."

Palermo says his goal in suing is to recoup his legal costs, with any added proceeds going to local animal shelters. He noted that the disciplinary letter recommended "negotiating a consent agreement with Dr. Reilly" — presumably a voluntary and temporary suspension of his veterinarian's license.

"For Zeke's sake and the sake of dog lovers, I want this to be resolved fairly," he said. "A vet is a sacred person for a lot of us. That message has to get out."