NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-208

ERNEST J. CARDILLO, JR.

vs.

DONALD M. CHABON.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Ernest J. Cardillo, Jr., the former fire chief for the town of Stockbridge, appeals from a judgment of the Superior Court granting the defendant's motion for summary judgment and dismissing his complaint for defamation and infliction of emotional distress.  Cardillo claims that the judge erred in granting summary judgment to the defendant, Donald M. Chabon, because Chabon's statements to a newspaper reporter were defamatory and made with actual malice.  For the reasons set forth below, we affirm the entry of summary judgment in favor of Chabon.

Background.  We view the facts in the light most favorable to the nonmoving party, here, Cardillo, and conduct an

independent examination of the record as a whole. Reilly v. Associated Press, 59 Mass. App. Ct. 764, 765 (2003), citing Dulgarian v. Stone, 420 Mass. 843, 847 (1995).

In 2012, Cardillo was appointed to the position of fire chief for the town of Stockbridge.[1] That same year, Cardillo received an unsolicited telephone call from a sales representative of a New York company, Pioneer Products Inc. (Pioneer). Cardillo agreed to purchase four gallons of fire hose and gear cleaner from Pioneer.[2] While the parties did not sign a written contract, it is undisputed that Cardillo agreed to this purchase and submitted the invoice to the town for payment.[3] Sometime after the initial purchase, Cardillo was contacted by Pioneer and told that the purchase price paid for his first order was contingent on accepting additional shipments. The sales representative told Cardillo that if he did not place an additional order, Pioneer would submit an amended invoice for the first shipment at a significantly higher

---

[1] In 2015, in addition to his role as fire chief, Cardillo was elected to serve a term on the three-member selectboard for the town. He was reelected to serve his third term in 2018. Cardillo served with Chabon, who was elected to the selectboard in 2016 and Terence Flynn, who was elected in 2017.

[2] The first purchase from Pioneer amounted to $229.04.

[3] Starting in 2014, Cardillo, using his work computer and during his working hours, began maintaining a budgetary spreadsheet for the purchases he approved for the fire department.

2

price.  Although there did not appear to be anything in writing memorializing Pioneer's claim that the price could be increased retroactively, Cardillo felt pressured and placed an additional order to avoid the ballooning costs.

In 2014, Pioneer contacted Cardillo and offered to sell a product referred to as "Fire Foam," and Cardillo agreed to the purchase, believing that the price was favorable to the town.  A few months later, Pioneer telephoned Cardillo and insisted that he purchase more Fire Foam.  Cardillo explained that the town did not need any more of this product, as it still had plenty of stock remaining from the original purchase.  Again, Cardillo was reminded that if he did not place an additional order, Pioneer would need to revise the original bill to reflect a significantly higher price that would be applied retroactively. Cardillo placed another order to avoid this consequence.  This pattern continued for the next four years and, while the initial purchases were modest, the quantity and cost of the products ordered by Cardillo increased significantly over the course of time.[4]

---

[4] For example, while the first purchase order in 2012 was less than $300, in a two-month time frame between December 2016 and February 2017, Cardillo purchased approximately $13,500 worth of products.

In 2018, one of Cardillo's purchases came to the attention of the town administrator, resulting in the selectboard retaining town counsel.[5]  Town counsel (Miyares) was tasked with investigating Cardillo's purchases from Pioneer and a related company, Noble Industrial Supply Corp. (Noble), and issuing a report (the "Miyares report").  The Miyares report found that both Pioneer and Noble had a history of defrauding small town governments, especially fire departments.  The Better Business Bureau had received complaints that the companies would initially offer to sell a product at a "seemingly favorable price" but then later demand additional purchases be made to avoid being charged for prior purchases at a higher rate.  Pioneer and Noble shipped more products, each time with the representation that the customer had to accept the delivery to avoid additional charges.  Even when customers complained that they had an adequate supply of a particular product, the message from Pioneer and Noble was firm.  They would offer to switch to a different product, but the customer was obligated to pay for additional purchases.

With this backdrop, Miyares reviewed the records for the purchases made by Cardillo and noticed some discrepancies.  In

---

[5] At the time, the three-member selectboard for the town of Stockbridge consisted of Chabon, Flynn, and Cardillo.  As a selectboard member, Cardillo recused himself from matters relating to the fire department.

4

December 2016, Cardillo agreed to purchase $6,779 of deicer from Pioneer. However, Cardillo's spreadsheet identified the vendor as Fire Tech instead of Pioneer. Two months later, Cardillo purchased additional deicer from Pioneer totaling $6,780 but logged the vendor as Meadow Farm and described the expenditure as fuel. The pattern was repeated in 2017, when Cardillo purchased over $7,500 of supplies (heavy duty truck wash and hose and gear cleaner) despite making the same purchase several months previous. This purchase was from Noble, but Cardillo listed the vendor as Stock Motor Car on the spreadsheets.

Miyares compared the prices charged by Pioneer and Noble with market prices for the same or similar products and concluded that the town was overcharged by at least $45,000.[6] This estimate "did not take into account the fact that many of the products received are in excess of the Department's needs and may never actually be used." Miyares was unable to estimate the loss due to oversupply because the town accountant lacked necessary information such as the amount of supplies the fire department ordinarily used and whether the town could "obtain some return" from selling the excess products. After the issuance of the Miyares report, Cardillo submitted a partial

---

[6] The town had not yet paid $20,000 in outstanding invoices, so "while the final loss figure may be higher," the report concluded that Pioneer and Noble caused "at least $25,000 in losses to the Town."

5

inventory of the existing products[7] and the town estimated that the cost of surplus products exceeded $40,000. Miyares concluded that Cardillo's purchases were improper and in violation of G. L. c. 30B, § 4, and provided the selectboard with recommendations to ensure that town employees abide by applicable procurement laws.[8]

On February 5, 2019, the two selectboard members, Chabon and Flynn, conducted a public hearing at which Cardillo was present and represented by counsel. Cardillo was examined by Miyares and given the opportunity to present testimony and evidence. Cardillo stated that he did not dispute anything contained in the Miyares report. Cardillo testified that, when dealing with Pioneer and Noble, he never determined if the items purchased were needed, whether the purchase price was at fair market value, or whether the vendors were reputable. At the conclusion of the hearing, Chabon and Flynn voted to terminate Cardillo's employment as the fire chief, effective immediately.

---

[7] The partial inventory submitted by Cardillo revealed that the fire department had a substantial inventory of the purchased items, ranging from an excess of one year's supply of truck wash to an excess of five years' supply of foam.

[8] Miyares concluded Cardillo's purchases violated G. L. c. 30B because they were not made by the town's chief procurement officer, three written quotations were not obtained prior to purchase, and certain required documentation for purchases over $10,000 was not maintained.

Two weeks later, the selectboard sent Cardillo a termination letter adopting the findings of the Miyares report and estimating that the town was overcharged $45,000 for the items purchased and suffered an additional $40,000 loss due to excess products.

On February 8, 2019, the Springfield Republican newspaper published an article in response to members of the fire department protesting Cardillo's termination.[9] The article stated that Cardillo was terminated after repeatedly falling "victim to scammers" in the purchasing of equipment for the fire department. The article reported that the selectboard had estimated that Cardillo's actions cost the town around $83,000. Chabon told the reporter that after Cardillo had learned that he had been taken advantage of, he tried to conceal the purchases and "[h]e changed the books." After the newspaper article was published, Cardillo filed suit against Chabon alleging defamation and infliction of emotional distress. Specifically, Cardillo alleges that two of Chabon's statements were defamatory; first, that Cardillo's actions cost the town around $83,000, and second that Cardillo "changed the books" once he realized that he had fallen prey to a purchasing scam.

_____

[9] The article was entitled "Stockbridge firefighters walk out to protest chief's dismissal; selectmen chair says service not affected."

Discussion. We review the grant of summary judgment de novo and consider "whether, viewing the evidence in the light most favorable to the nonmoving party, [Cardillo][,] all material facts have been established and the moving party [Chabon] is entitled to judgment as a matter of law" (citation omitted). LaChance v. Boston Herald, 78 Mass. App. Ct. 910, 910 (2011). Notably, in defamation cases such as this, resolving a case by way of summary judgment is "especially favored" because "[a]llowing a trial to take place in a meritless case 'would put an unjustified and serious damper on freedom of expression.'" Id. at 910-911, quoting Dulgarian, 420 Mass. at 846.

"The elements of a claim of defamation are 'that the defendant was at fault for the publication of a . . . statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss.'" Kilnapp Enters., Inc. v. Massachusetts State Auto. Dealers Ass'n, 89 Mass App. Ct. 212, 217 (2016), quoting White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 (2004). To prevail on his defamation claims, Cardillo must prove that Chabon's statements to the reporter were both defamatory and false. Dulgarian, 420 Mass. at 847. "This requirement insulates from liability statements that are not provable as false." Id. And, when the plaintiff is a public figure, as is conceded here, an

additional element must be proved -- that the false and defamatory statement was "made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 279-280 (1964).

We turn to the two alleged defamatory statements made by Chabon and analyze each statement separately.

1. Cardillo cost the town around $83,000. We first consider whether Cardillo has met his burden of establishing that Chabon's statement that Cardillo cost the town around $83,000 was capable of being proven false. Cardillo contends that this statement was false because Chabon significantly overinflated the actual loss to the town, which he claims was closer to $25,000. A review of the summary judgment record does not support Cardillo's position.

Here, the Miyares report, which Cardillo accepted in its entirety, concluded that Cardillo's actions caused the town to purchase fire products that were both overpriced and unnecessary for the town's consumption. While the report did not provide a precise total loss to the town, it did estimate that the town was overcharged by at least $45,000 and purchased an oversupply of products that was "in excess of the Department's needs and may never actually be used."

In its written statement terminating Cardillo, issued after the public hearing, the selectboard adopted the findings of the Miyares report and quantified the loss to the town. It determined that the town paid for fire products that exceeded fair market value by approximately $45,000, plus, pursuant to a partial inventory Cardillo had prepared of the purchased items on hand, the "amounts billed for these excess items are estimated to have cost the [t]own in excess of $40,000."

Therefore, the record does not support Cardillo's assertion that Chabon's statement that Cardillo's actions cost the town "around $83,000" was "grossly inflated" and necessarily false. In fact, Chabon's statement was consistent with Miyares's estimate that the overpriced products alone cost the town "at least $45,000" and the board's later estimate, after Cardillo submitted a partial inventory, that it suffered an additional loss of about $40,000 in oversupply. These figures were just that -- estimates -- and while the actual loss to the town was not determined with precision, without more, Cardillo cannot establish an essential element of his defamation claim -- that Chabon's statement was false.

Moreover, we need not determine whether Chabon's cost estimate is mathematically correct, as we agree with Chabon that his statement is substantially true. If a statement is substantially true, a minor or negligible inaccuracy will not

10

support a defamation claim.  Reilly, 59 Mass. App. Ct. at 770.
We consider the allegedly defamatory statements as a whole to
determine whether the "gist" or "tenor" of the statements were
accurate (citations omitted).  Masson v. New Yorker Magazine,
Inc., 501 U.S. 496, 517 (1991); Salvo v. Ottaway Newspapers,
Inc., 57 Mass. App. Ct. 255, 262 (2003).  We take into
consideration the impact of the inaccuracy on the reader or
listener, as compared to the impact of the truth.  See Jones v.
Taibbi, 400 Mass. 786, 795-796 (1987).  "Put another way, the
statement is not considered false unless it 'would have a
different effect on the mind of the reader from that which the
pleaded truth would have produced.'"  LaChance, 78 Mass. App.
Ct. at 912 quoting Masson, 501 U.S. at 517.

Here, Chabon's statement, read as a whole, communicated
that the town incurred a substantial cost when Cardillo fell
prey to a purchasing scam orchestrated by Pioneer and Noble.
The gist of Chabon's statement, even if the precise amount of
loss to the town was inaccurate, is substantially true.  The
impact on the reader was the same regardless of whether Chabon's
or Miyares's estimate reflected a thorough accounting of the
financial harm to the town.  See Jones, 400 Mass. at 800
(statement that inaccurately reported that person had passed
four separate polygraph tests when only two had been passed was
substantially true and did not amount to falsity as impact of

11

inaccurate statement did not create substantially greater defamatory sting than accurate report would have).  We conclude that, given the substance of the statement and when read as a whole, Chabon's statement was essentially true and was insufficient to establish falsehood for purposes of a claim of defamation.

2.  Cardillo "changed the books".  We turn next to the second statement attributed to Chabon, that Cardillo "changed the books" to conceal his excess purchases once he realized he had been taken advantage of by Pioneer and Noble.  Cardillo first argues that in determining whether Chabon's statement was false, the judge erred in considering the spreadsheets.  Cardillo argues that the spreadsheets fall within an exemption to the Public Records Law, G. L. c. 4, § 7, because they were his own personal notations that he used to explain his purchases.  We are not persuaded.  As an initial matter, we do not see how it is relevant whether the spreadsheets are exempted from disclosure under G. L. c. 4, § 7, given that Chabon's statement makes no mention of public records at all.  In any event, the definition of a public record under G. L. c. 4, § 7, is broad and includes records such as the spreadsheets created by Cardillo in connection with his role as fire chief.  See Rahim v. District Attorney for the Suffolk Dist., 486 Mass. 544, 547 (2020).  See also G. L. c. 4, § 7, Twenty-sixth (public

12

record is "all books, papers, . . . financial statements, statistical tabulations, or other documentary materials or data, regardless of physical form or characteristics, made or received by any officer or employee").  Cardillo's argument that the spreadsheets fall within the statutory exception for "personal" materials is equally unpersuasive, as it is undisputed that Cardillo's employment contract required him to keep such financial records and he created the spreadsheets during working hours using the computer issued by the town for the fire department.

Next, Cardillo claims that even if the spreadsheets were properly considered, Chabon's statement that he "changed the books" was defamatory and false.  It is undisputed that Cardillo recorded information in the spreadsheets that misidentified vendors and purchases once he became aware that Pioneer and Noble had ensnared him in a purchasing scam.[10]  In two instances, Cardillo identified purchases from two merchants, Meadow Farm and Fire Tech, when they were from Pioneer and Noble, and described one such purchase as fuel when it was, in fact, deicer.  It follows that since Chabon's statement that Cardillo

_____

[10] Cardillo later attempted to explain these discrepancies by indicating that he placed an asterisk next to these purchases to indicate the purchase of fire hose or foam.  The Miyares report found no such asterisk or any other such denotation.

13

"changed the books" is substantially true, Cardillo's defamation claim must fail accordingly.

3.  Actual Malice.  We also conclude that Cardillo has not met his burden with respect to proving that Chabon acted with "actual malice," which has been defined as proof that the speaker knew that the statement was false or acted with reckless disregard as to whether it was false or not.  See King v. Globe Newspaper Co., 400 Mass. 705, 719 (1987).  Cardillo's argument in support of actual malice is based in part on his misguided belief that the spreadsheets are not public records.  For the reasons stated above, we are not persuaded by this argument.

Chabon was aware from the Miyares report that Cardillo's spreadsheets contained misleading information and that the town incurred a significant loss due to Cardillo's transactions with Pioneer and Noble.  Again, Cardillo did not dispute anything contained in the Miyares report.  Chabon's statements, which were consistent with the Miyares report, therefore, cannot support an inference that they were made with knowledge of their falsity or that Chabon had serious doubts as to their truth. Further, we agree with the motion judge that it is irrelevant to the actual malice determination that Chabon was aware that Cardillo had fallen prey to a purchasing scam, that the town received "some benefit" from the products, or that Chabon nevertheless offered Cardillo continued employment in the fire

14

department.  He offers no other proof to support his contention that Chabon's statements were published with either knowledge of untruth or a reckless disregard as to whether they were false.

Since neither falsity nor actual malice has been established, Cardillo's defamation claims necessarily fail. Accordingly, the judge's order of summary judgment was proper.[11]

<u>Judgment affirmed</u>.

By the Court (Shin, Walsh & Allen, JJ.[12]),

Clerk

Entered:  March 26, 2026.

---

[11] Cardillo's complaint also asserted claims of intentional and negligent infliction of emotional distress based on the defamation claim.  As summary judgment was granted on the defamation claims, the judge also entered summary judgment on these claims, concluding they were derivative of the defamation claim.  Cardillo has not raised any argument as to this portion of the grant of summary judgment.

[12] The panelists are listed in order of seniority.